# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>THE STATE OF NEW JERSEY;<br>MIKIE SHERRILL, Governor of New<br>Jersey, in her official<br>capacity,<br><br>    Defendants. | Hon. Georgette Castner, U.S.D.J.<br><br>Civil Action No.: 26-1770 |

# BRIEF IN SUPPORT OF DEFENDANTS'
# MOTION TO DISMISS

Jeremy M. Feigenbaum
*Solicitor General*

Stephen Ehrlich
*Deputy Solicitor General*

Kristin L. Vassallo
*Assistant Attorney General*

Surinder K. Aggarwal
Liza B. Fleming
Max G. Lesser
Justine M. Longa
September R. McCarthy
Phoenix Myers
*Deputy Attorneys General*
    On the Brief

JENNIFER DAVENPORT
ATTORNEY GENERAL OF NEW JERSEY

Attorney for Defendants
R.J. Hughes Justice Complex,
25 Market Street, P.O. Box 112
Trenton, New Jersey 08625
(862) 350-5800

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................... 1

BACKGROUND ................................................................................... 3

LEGAL STANDARD ............................................................................ 8

ARGUMENT ........................................................................................ 9

    I.    The Federal Government Lacks Standing. ........................................ 9

    II.   EO12 Is Not Preempted By Federal Law. ...................................... 13

        A.    The INA Cannot Preempt EO12. ............................................... 14

        B.    The INA Does Not Preempt EO12. ........................................... 18

    III.  EO12 Does Not Violate Intergovernmental Immunity. ................... 28

        A.    Intergovernmental Immunity Cannot Prohibit EO12. ................ 29

        B.    Intergovernmental Immunity Does Not Violate EO12. ............. 31

CONCLUSION ................................................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adderley v. Florida,*
 385 U.S. 39 (1966)..................................................................19, 29

*Ballentine v. United States,*
 486 F.3d 806 (3d Cir. 2007) ........................................................ 9

*Bond v. United States,*
 564 U.S. 211 (2011)................................................................... 24

*Camfield v. United States,*
 167 U.S. 518 (1897)................................................................... 31

*Cedar Point Nursery v. Hassid,*
 594 U.S. 139 (2021)................................................................... 30

*City & Cnty. of San Francisco v. Barr,*
 965 F.3d 753 (9th Cir. 2020) ..................................................... 16

*City & Cnty. of San Francisco v. EPA,*
 604 U.S. 334 (2025)................................................................... 23

*City & Cnty. of San Francisco v. Sessions,*
 349 F. Supp. 3d 924 (N.D. Cal. 2018) ....................................... 16

*City of El Cenizo v. Texas,*
 890 F.3d 164 (5th Cir. 2018) ..................................................... 21

*Clark v. Coupe,*
 55 F.4th 167 (3d Cir. 2022) ......................................................... 9

*CoreCivic, Inc. v. Governor of New Jersey,*
 145 F.4th 315 (3d Cir. 2025) ....................................30, 32, 33, 34

*County of Ocean v. Grewal,*
 475 F. Supp. 3d 355 (D.N.J. 2020) ............................... 16, 23, 33

iii

*Davis v. Mich. Dep't of Treas.*,
  489 U.S. 803 (1989)................................................................................... 35

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)................................................................................... 10

*Duquesne Light Co. v. EPA*,
  166 F.3d 609 (3d Cir. 1999) ...................................................................... 11

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024)................................................................................... 10

*Fed. L. Enf't Officers Ass'n v. Att'y Gen. N.J.*,
  93 F.4th 122 (3d Cir. 2024) ...............................................................19, 25

*Galarza v. Szalczyk*,
  745 F.3d 634 (3d Cir. 2014) .......................................................... 17, 22, 27

*Guerrero-Sanchez v. Warden York Cnty. Prison*,
  905 F.3d 208 (3d Cir. 2018) ...................................................................... 14

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*,
  678 F.3d 235 (3d Cir. 2012) ........................................................................9

*Joyner v. Mofford*,
  706 F.2d 1523 (9th Cir. 1983) ................................................................... 19

*Kansas v. Garcia*,
  589 U.S. 191 (2020)...................................................................... 14, 20, 25

*Kipke v. Moore*,
  165 F.4th 194 (4th Cir. 2026) ................................................................... 29

*Klotz v. Celentano Stadtmauer & Walentowicz LLP*,
  991 F.3d 458 (3d Cir. 2021) ...................................................................... 20

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)................................................................................10, 13

*McHenry County v. Raoul*,
　44 F.4th 581 (7th Cir. 2022)............................................................ passim

*MD Mall Assocs. v. CSX Transp.*,
　715 F.3d 479 (3d Cir. 2013) ...........................................................13, 14

*Medtronic, Inc. v. Lohr*,
　518 U.S. 470 (1996)........................................................................ 19

*Murphy v. NCAA*,
　584 U.S. 453 (2018)............................................................. 13, 15, 28

*Murthy v. Missouri*,
　603 U.S. 43 (2024)........................................................................... 11

*New York v. United States*,
　505 U.S. 144 (1992).......................................................................... 15

*Nixon v. Mo. Mun. League*,
　541 U.S. 125 (2004).......................................................................... 18

*Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of N.J.*,
　8 F.4th 176 (3d Cir. 2021)........................................................16, 20, 21, 22

*Pennsylvania v. Navient Corp.*,
　967 F.3d 273 (3d Cir. 2020) ............................................................. 19

*Printz v. United States*,
　521 U.S. 898 (1997)................................................................. passim

*Pub. Int. Legal Found. v. Sec'y of the Commonwealth*,
　136 F.4th 456 (3d Cir. 2025) ............................................................. 9, 10

*Renal Physicians Ass'n v. U.S. DHHS*,
　489 F.3d 1267 (D.C. Cir. 2007)......................................................... 13

*Simon v. E. Ky. Welfare Rights Org.*,
　426 U.S. 26 (1976)........................................................................... 11

*Spokeo v. Robins*,
   578 U.S. 330 (2016) ................................................................. 10

*Texas v. U.S. Dep't of Homeland Sec.*,
   123 F.4th 186 (5th Cir. 2024) ....................................................... 30, 34, 35

*Thompson v. Del. Dep't of Servs. for Children, Youth & their Fams.*,
   44 F.4th 188 (3d Cir. 2022) ........................................................... 9

*Transource Pa., LLC v. DeFrank*,
   156 F.4th 351 (3d Cir. 2025) ......................................................... 19

*Trump v. United States*,
   603 U.S. 593 (2024) ................................................................. 24

*United States v. Blumenthal*,
   315 F.2d 351 (3d Cir. 1963) ........................................................... 29

*United States v. California*,
   921 F.3d 865 (9th Cir. 2019) ........................................................ passim

*United States v. Class*,
   930 F.3d 460 (D.C. Cir. 2019) ......................................................... 29

*United States v. Illinois*,
   796 F. Supp. 3d 494 (N.D. Ill. 2025) ................................................ passim

*United States v. New Jersey*,
   No. 20-1364, 2021 WL 252270 (D.N.J. Jan. 26, 2021) ................... 23, 36, 38

*United States v. New York*,
   810 F. Supp. 3d 329 (N.D.N.Y. 2025) ................................................ passim

*United States v. New York*,
   814 F. Supp. 3d 266 (N.D.N.Y. 2025) ................................................... 24

*United States v. Washington*,
   596 U.S. 832 (2022) .............................................................29, 30, 35, 37

*Wilson v. USI Ins. Serv. LLC*,
  57 F.4th 131 (3d Cir. 2023) ....................................................................... 9

**Statutes and Regulations**

18 U.S.C. § 372 ............................................................................................ 20, 23
18 U.S.C. § 1071 .......................................................................................... 20, 23
8 C.F.R. § 287.7 ........................................................................................... 20, 22
8 U.S.C. § 1103(a)(3) ......................................................................................... 20
8 U.S.C. § 1182 .................................................................................................. 20
8 U.S.C. § 1225(b) ....................................................................................... 20, 22
8 U.S.C. § 1226(c) ........................................................................................ 20, 22
8 U.S.C. § 1226a .......................................................................................... 20, 22
8 U.S.C. § 1227 ............................................................................................ 20, 22
8 U.S.C. § 1228 ............................................................................................ 20, 22
8 U.S.C. § 1231(a) ....................................................................................... 20, 22
8 U.S.C. § 1324(a)(1)(A)(iii) ...................................................................... 20, 24
8 U.S.C. § 1357 ............................................................................................ 20, 21
8 U.S.C. § 1373 ............................................................................................ 20, 21
8 U.S.C. § 1644 ............................................................................................ 20, 21
N.J. Stat. Ann. § 2B:12-15 ............................................................................ 6, 26
N.J. Stat. Ann. § 2B:6-1(b) ............................................................................ 6, 26
P.L. 2025, c.401 ................................................................................................... 5
P.L. 2026, c.5 .............................................................................................. 7, 8, 27

**Other Authorities**

*Atty. Gen. Law Enf. Directive No. 2018-6 v2.0* (Sept. 27, 2019),
  https://tinyurl.com/yxsfk5cn ................................................................. 7

Br. for United States as Amicus Curiae, *CoreCivic Inc v. Governor of New Jersey, et al.*, No. 23-2598, ECF No. 67 (3d Cir. Mar. 20, 2024) ............................... 34

Emily Rose Grassi & Shaira Arias, *Elementary students run from bus stop during ICE operation at NJ apartment*, NBC Philadelphia (Feb. 13, 2026),
  https://tinyurl.com/ycj7x5t4 ................................................................. 4

N.J. Dep't of Child. & Fams., *Guidance for Federal Civil Immigration Enforcement at DCF Facilities* (2025), https://tinyurl.com/ybz5uwk4 ............................ 12

N.J. Exec. Order 12 ........................................................................ passim

Steve Strunsky*, ICE chase ends in multi-vehicle crash involving 3 children, N.J. city says*, N.J.com (Feb. 26, 2026), https://tinyurl.com/543wx5un .................... 4

viii

## INTRODUCTION

This is a case about the State's ability to control the use of its own property and resources. The State of New Jersey, like all other States, maintains property and resources to serve its residents. The State uses those properties to provide social services, serve children and families, offer emergency medical care, speak with witnesses to or victims of a crime, and much more. Some of the State's properties are, of course, held open to the public. But others—from private government workplaces to medical offices to state police headquarters—limit their access to the relevant purposes for which they were designed.

New Jersey, like many other States, has concluded that it can only put its properties and resources to their intended purposes if it can responsibly limit the role of its property and resources in civil immigration enforcement. As the State concluded, the "use of certain [s]tate properties and resources for civil immigration enforcement purposes would interfere with or burden [s]tate government activities" because it would "discourag[e] sensitive populations from seeking essential services" at those properties "or discourag[e] their relatives or caregivers from accompanying or visiting them." N.J. Exec. Order 12 at 2–3 (EO12). But limiting which residents would be willing to access state properties and resources—and their services—would "erode public trust in [s]tate government;" would "undermine public safety;" and "would risk causing undue harm to all New Jerseyans." *Id.* at 3. Recent high-profile civil immigration enforcement actions only heightened those already-significant risks.

1

EO12 reflects New Jersey's effort to make state property safe for New Jerseyans. EO12, to be sure, permits state agencies to make state properties available for civil immigration use in certain instances. If civil immigration agents have a judicial warrant or judicial order, EO12 in no way prevents or limits agencies from making their properties available for use. And nothing in EO12 calls on state agencies to restrict civil immigration agents' access to state property that is open to the general public, on the same terms on which the general public can access it. Nor does EO12 place any new restrictions on law enforcement's cooperation with civil immigration enforcement. But EO12 does make clear that, beyond these exceptions, New Jersey's "Executive Branch departments and agencies shall not permit or consent to federal immigration officers entering, accessing, or using nonpublic areas of [s]tate property for the purpose of facilitating federal enforcement of civil immigration law" and "shall not permit or consent to federal immigration officers using [s]tate property as a staging area, processing location, or operations base for the purpose of facilitating federal enforcement of civil immigration law." EO12 at 4. In other words, where the limit applies, EO12 is clear: state properties must be put to the use for which the State designed them, not put into service for civil immigration purposes instead.

In restricting the use of its own properties and resources, EO12 is plainly valid. Undeterred, the Federal Government argues that EO12 contravenes the Supremacy Clause in three respects: that it is preempted and that it contravenes the doctrine of intergovernmental immunity twice over. But none hold up. Initially, all of these claims fail because they represent an unconstitutional effort by

2

the Federal Government to commandeer the State and its properties for federal service. Our Constitution, including the Tenth Amendment, makes clear the Federal Government bears responsibility for enforcing its laws and programs; it cannot force States to participate in or facilitate its efforts. That is precisely what the Federal Government demands: that the State provide special access for civil immigration purposes in otherwise nonpublic areas. It thus insists on overriding both the State's choice as a property owner and the State's Chief Executive in setting Executive Branch policies over executive facilities.

In any event, the preemption and intergovernmental immunity arguments fail on their own terms. The preemption claim fails because nothing in the text and structure of the Immigration and Nationality Act (INA) speaks to this question, let alone clearly. The INA contains no mandate that civil immigration officers have warrantless access to nonpublic areas of state buildings. And the Complaint's cited provisions do not even regulate private parties, so they have no preemptive effect whatsoever. The intergovernmental immunity claims fare no better. EO12 regulates state actors, not federal officers, and distinguishing between criminal and immigration operations is not discrimination against the Federal Government itself—and, in any event, is a permissible choice any property owner may make.

This Court should dismiss the Complaint in full.

## BACKGROUND

The State of New Jersey has long limited its law enforcement's role in affirmatively assisting with civil immigration efforts—limits this Court and the

3

Third Circuit years ago upheld. In 2026, the State engaged in a "renewed examination" of how its resources "could be leveraged to assist with" civil immigration enforcement. *See* EO12 at 2.[1] The State identified that "the use of certain [s]tate properties and resources for civil immigration enforcement purposes would interfere with or burden [s]tate government activities, erode public trust in [s]tate government, and undermine public safety." *Id.* at 2–3. That, in turn, "would risk causing undue harm to all New Jerseyans" by "discouraging sensitive populations from seeking essential services or discouraging their relatives or caregivers from accompanying or visiting them." *Id.* at 3. After all, "property and resources owned and controlled by the State are intended to serve the residents of New Jersey." *Id.* at 2.

---

[1] There were clear reasons for that renewed examination—the "deeply troubling trends in militarized federal civil immigration enforcement" across the United States, *see* EO12 at 2, which in turn heightened the risk that allowing the use of state resources in civil immigration enforcement would deter residents from accessing those state resources themselves. Indeed, as the Executive Order noted, these troubling and high-profile trends included "the arrests and detention of United States citizens," "masked agents unleashing chemical irritants on bystanders and non-violent protestors," the "killings of United States citizens by federal officers," and "incidents involving racial profiling." *Id.* New Jersey has not escaped unscathed. For example, in late February, a car chase led by Immigration and Customs Enforcement (ICE) resulted in a multiple vehicle crash in Newark, causing severe injuries and placing innocent bystanders at risk. *See* Steve Strunsky, *ICE chase ends in multi-vehicle crash involving 3 children, N.J. city says*, N.J.com (Feb. 26, 2026), https://tinyurl.com/543wx5un. And just weeks before that, ICE raids near a school bus stop in Camden County caused fourth and fifth grade students to scatter in fear. *See* Emily Rose Grassi & Shaira Arias, *Elementary students run from bus stop during ICE operation at NJ apartment*, NBC Philadelphia (Feb. 13, 2026), https://tinyurl.com/ycj7x5t4.

Given these serious concerns, both the Legislature and the Governor acted. The latter is the subject of this suit.

## A.     The Safe Communities Act And Executive Order 12

In efforts to ensure that all New Jerseyans feel secure in their own communities and empowered to access necessary state resources, the Legislature passed the Safe Communities Act in January 2026. That Act directs the Attorney General, in consultation with stakeholders, to develop policies to ensure residents' safety and personal freedom in a variety of sensitive locations, including, among others, health care facilities, public schools, courthouses, domestic violence shelters, food pantries, and social services offices. P.L. 2025, c.401, § 4.

The Act's legislative findings recognize that "New Jersey is a healthier, safer, and more prosperous State when all residents [can] access the [state government] services for which they are eligible" without "fear" or "hesitat[ion]." *Id.* § 2. So "all relevant municipal, county, and [s]tate agencies" should engage in a "coordinated effort" to "create conditions that empower residents to seek the help they need from public services." *Id.* Those governments should also "attend to local priorities rather than carrying out federal civil law enforcement initiatives for which they lack the requisite experience," activities that would "contravene[] the priorities of freedom and safety for New Jersey residents." *Id.*

Soon after the Act's passage, Governor Mikie Sherrill issued Executive Order 12. Consistent with the Act's legislative findings, EO12 works to maintain safe public spaces for New Jerseyans to access necessary state services without fear; build trust between residents and state law enforcement; and ensure that

5

state properties and resources are used to the benefit of New Jersey residents, rather than to support militarized federal civil immigration enforcement that places residents at risk. *See* EO12 at 1–3.

In support of those efforts, EO12 establishes a framework for interactions between state officials and federal immigration enforcement officers on state property. If authorized by a judicial warrant or judicial order, federal immigration officers are permitted to enter, access, or use nonpublic areas of state property to facilitate federal enforcement of civil immigration law. EO12 ¶ 2. Similarly, when authorized by judicial warrant or judicial order, federal immigration officers can use state property as a staging area, processing location, or operations base to facilitate federal enforcement of immigration law. *Id.* ¶ 3. And even without a judicial warrant or order, federal immigration authorities may access state property in the same manner as the general public. *Id.* ¶¶ 2–3; 5.e.

State property includes only those "facilities, premises, and parcels, or portions thereof, that are owned, operated, leased, or controlled by New Jersey Executive Branch departments and agencies." *Id.* ¶ 1.b. So, even beyond state property, EO12 leaves ample fora available for federal immigration enforcement. That includes federal and private property. *Id.* ¶¶ 2–3. But it also includes, for example, the majority of courthouses in New Jersey, which are owned by counties and municipalities. *See* N.J. Stat. Ann. § 2B:6-1(b); *id.* § 2B:12-15.

EO12 also emphasizes the many other ways that state and federal law enforcement are authorized to work together. EO12 commands that it "shall not

6

be construed to restrict, prohibit, or in any way prevent" state officials from "allowing federal authorities access to any state property that is open to the general public, on the same terms on which the general public can access such property," "complying with all applicable federal, State, and local laws and regulations," complying with valid judicial warrants and orders, and "facilitating the enforcement of the criminal laws of this State on State property." EO12 ¶¶ 5.a–c, e.

EO12 also clarifies that it "shall not be construed to restrict, prohibit, or in any way prevent" state officials from "engaging in conduct permitted by the [New Jersey] Attorney General's Immigrant Trust Directive." *Id.* ¶ 5.d. That Directive—upheld by the Third Circuit and recently codified into state statute—also endeavored to strengthen trust between New Jersey and its residents by developing a structure for collaboration between state officials and federal immigration enforcement officers. *See Atty. Gen. Law Enf. Directive No. 2018-6 v2.0* (Sept. 27, 2019), https://tinyurl.com/yxsfk5cn; *see also* P.L. 2026, c.5.[2] The Directive prohibits state and local law enforcement agencies from entering formal agreements to exercise federal immigration authority under 8 U.S.C. § 1357. *Id.* § 3(e). It also generally prohibits state and local law enforcement from helping to enforce civil immigration law by providing access to their nonpublic property, or by complying with civil immigration detainers,[3] unless the detainee commit-

---

[2] All citations to the substance of the Directive now refer to P.L. 2026, c.5.
[3] An immigration detainer is a request that state or local law enforcement either notify federal immigration officers before they release removable noncitizens

7

ted particular crimes or has a final order of removal. *Id.* § 3(c). Like EO12, however, the Directive allows full compliance with judicial warrants or court orders, among other exceptions. *Id.* § 3(d).

As a whole, EO12 provides a carefully tailored framework for state and federal interaction that centers New Jerseyans' ability to access state property.

### B.    This Case

Just days after the Governor issued EO12, the Federal Government sued. In a three-count facial challenge predicated solely on the Supremacy Clause, the Federal Government claims that EO12 is preempted because it poses an obstacle to federal immigration enforcement (Count One). The Federal Government also claims that EO12 violates intergovernmental immunity, by directly regulating the Federal Government (Count Two) and by discriminating against federal officers (Count Three). Compl. ¶¶ 68–83. The State now moves to dismiss.

## LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), this Court must "assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'" *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023). The Court must "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by

---

from correctional facilities, or hold noncitizens after their release date for federal agents to assume custody. *See* Compl. ¶ 59.

mere conclusory statements," *id.*, and focus solely on whether the factual content "allows the court to draw the reasonable inference that the defendant is liable," *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022). Without facts sufficient to "state plausible grounds for relief," a "complaint cannot survive." *Thompson v. Del. Dep't of Servs. for Children, Youth & their Fams.*, 44 F.4th 188, 194 (3d Cir. 2022). Similarly, under Rule 12(b)(1), the plaintiff "bears the burden of establishing the elements of standing." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007) (cleaned up). And courts "evaluating whether a complaint adequately pleads the elements of standing" will apply the same standards as those for Rule 12(b)(6) motions. *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012).

## ARGUMENT

The Federal Government asserts three types of Supremacy Clause claims: preemption, and direct regulation and discrimination in violation of intergovernmental immunity. Not only does it lack standing to bring those claims, but those claims fail on the merits.

## I.      The Federal Government Lacks Standing.

"Standing is a threshold jurisdictional issue." *Pub. Int. Legal Found. (PILF) v. Sec'y of the Commonwealth*, 136 F.4th 456, 461 (3d Cir. 2025). To establish Article III standing, the "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (quoting *Spokeo v. Robins*,

578 U.S. 330, 338 (2016)). Importantly, the Federal Government "bears the burden of establishing" its standing. *Spokeo*, 578 U.S. at 338. It cannot.

Where, as here, a plaintiff's "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,*" establishing standing becomes "substantially more difficult." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). In that scenario, "causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." *Id.* So it is the plaintiff's burden "to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.* "[M]ere speculation about the decisions of third parties" is not enough. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). Instead, "[t]o establish causation, the plaintiff must show a predictable chain of events leading from the government action to the asserted injury." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 385 (2024).

Initially, this is indeed a case about the regulation of third parties not before the Court: EO12 expressly governs only state employees. While the Federal Government tries to spin EO12 as directly prohibiting the actions of federal immigration officers, that is simply not true. *See, e.g.*, Compl. ¶¶ 12, 49. EO12 explicitly governs the acts of state "Executive Branch departments and agencies," making clear that they "shall not permit or consent to federal immigration officers" from either (1) "entering, accessing, or using nonpublic areas of State prop-

10

erty," or (2) "using State property as a staging area, processing location, or operations base for the purpose of facilitating federal enforcement of civil immigration law." EO12 ¶¶ 2–3. In other words, the order unambiguously regulates the conduct of state executive employees, not federal immigration officers. Federal officers can request precisely the same access to the very same state-owned properties as before; EO12 restricts only how the state actors respond. *See infra* Section III.B.1 (no direct regulation of the Federal Government).

Properly understood, then, the Federal Government cannot establish that a lack of access to these properties is traceable to EO12. As a matter of bedrock Article III principles, courts routinely reject standing if regulated parties might take the same action anyway. *See, e.g.*, *Murthy v. Missouri*, 603 U.S. 43, 73 (2024) (no standing where "requested judicial relief [ ] is an injunction stopping [the Federal Government] from coercing or encouraging the platforms to suppress speech" because "the platforms remain[ed] free to enforce or not to enforce, [their] policies—even those tainted by initial government coercion"); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42–43 (1976) (no standing where it was "purely speculative whether the denials of service" to indigent patients could fairly "be traced to" the challenged IRS Ruling "or instead result[ed] from decisions made by the hospitals without regard to the tax implications"); *Duquesne Light Co. v. EPA*, 166 F.3d 609, 613 (3d Cir. 1999) (no standing to challenge EPA rule because company's injury was product of independent state rule too).

That is fatal here. The Federal Government has not met its burden of plausibly alleging that, even absent EO12, state employees would allow the same

11

federal immigration officers the unfettered access to the state properties that they want. That is no small omission; state officials could always, in their discretion, refuse entry to immigration officers who lack a judicial warrant or order requiring entry. There are countless independent reasons for refusing entry. An individual state employee could wish to avoid involvement in immigration operations, fear civil exposure if something goes wrong, want to maintain consistency with how the public is managed, or even just be morally opposed to the Federal Government's enforcement tactics. Or a department that controls the property could reach the same conclusion, even if EO12 never existed. *See, e.g.*, N.J. Dep't of Child. & Fams., *Guidance for Federal Civil Immigration Enforcement at DCF Facilities* (2025), https://tinyurl.com/ybz5uwk4 . So even though the Federal Government complains about a lack of access to state property, that complaint is not traceable to EO12.

Redressability is even clearer: the Federal Government has not sufficiently pled that it would gain access to nonpublic areas of these state properties in the future even if this Court issued an order enjoining application of EO12. Even assuming the Federal Government were to prevail, *but see infra* Sections II–III (identifying defects in preemption and intergovernmental-immunity claims), the most it would obtain is relief preventing application of this statewide order; it would not obtain relief compelling state agencies to allow warrantless civil immigration enforcement on nonpublic areas of their properties. But at this point, those executive officials—part of the Executive Branch headed by the Gover-

12

nor—would be aware of her policy concerns regarding the impact of federal immigration enforcement on the intended uses of state properties, not to mention the Legislature's related findings. It is thus difficult to imagine rogue executive branch officers permitting such prospective access, regardless of whether EO12 is formally enjoined. In short, "undoing of the governmental action" may "not undo the harm" because "the new status quo" may "hold in place the alleged effect of" the invalidated government action. *Renal Physicians Ass'n v. U.S. DHHS*, 489 F.3d 1267, 1278 (D.C. Cir. 2007). Simply put, the Complaint insufficiently alleges that the Federal Government would gain unencumbered access to state property even if it prevails.

Consequently, the Federal Government has come nowhere close to showing that it is "likely, as opposed to merely speculative," that its alleged injury—being precluded from nonpublic areas of state property—is traceable to EO12 or redressable by an order enjoining EO12. *Lujan*, 504 U.S. at 561 (cleaned up).

## II.    EO12 Is Not Preempted By Federal Law.

Courts have recognized three types of preemption: express, field, and conflict. *Murphy v. NCAA*, 584 U.S. 453, 477 (2018). The Federal Government relies solely on conflict preemption here. Conflict preemption arises only "where it is impossible for a private party to comply with both state and federal law," *MD Mall Assocs. v. CSX Transp.*, 715 F.3d 479, 495 (3d Cir. 2013), or where the state law poses an obstacle to the full effectuation of a federal statute's "text and structure," *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). Here, the Federal Government understandably does not allege that it is "impossible" for anyone "to comply

13

with both state and federal law." *MD Mall*, 715 F.3d at 495. The only issue is whether EO12 prevents the effectuation of the INA's text and structure.

It cannot and does not. For one, the INA cannot have the preemptive effect the Federal Government contends. After all, if federal law preempted EO12, States would be forced to assist federal immigration officers in enforcing federal law by allowing special access unavailable to the public. That result would unconstitutionally commandeer the States. In any event, the INA does not have this preemptive effect—that is, the Federal Government's preemption arguments fail on their own terms. Its Complaint cites only a hodgepodge of statutory provisions and "some brooding federal interest" in enforcing federal immigration law. *Garcia*, 589 U.S. at 202 (cleaned up). That is far from enough. So, whether based on an anticommandeering analysis or a preemption analysis, this Court should dismiss the preemption claim.

## A.    The INA Cannot Preempt EO12.

As an initial matter, in interpreting the INA, this Court should be mindful that the Federal Government's view violates the anticommandeering doctrine. This matters in two key respects. First, because the Federal Government's reading of the INA would make it unconstitutional, it is likely an incorrect one. *See, e.g.*, *Guerrero-Sanchez v. Warden York Cnty. Prison*, 905 F.3d 208, 223 (3d Cir. 2018) (citing "cardinal principle of statutory interpretation … that when an Act of Congress raises a serious doubt as to its constitutionality, … courts will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided"). Second, even if the Federal Government's reading

14

were correct, the INA still would not preempt EO12 because an unconstitutional federal law has no preemptive effect at all.

Drawn from the Constitution's structure and the Tenth Amendment, the anticommandeering doctrine prevents Congress from "issu[ing] direct orders to the governments of the States." *Murphy*, 584 U.S. at 471. "The Framers' experience under the Articles of Confederation had persuaded them that using the States as the instruments of federal governance was both ineffectual and provocative of federal-state conflict." *Printz v. United States*, 521 U.S. 898, 919 (1997). So they constitutionally enshrined the idea that "[n]o matter how powerful the federal interest involved," States always have the power to "decline to administer [a] federal program." *New York v. United States*, 505 U.S. 144, 177–78 (1992). This not only "prevents Congress from shifting the costs of regulation to the States" but also makes clear which entity is responsible for a policy so that voters "know who to credit or blame." *Murphy*, 584 U.S. at 473–74. The upshot is simple: the Federal Government cannot "compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz*, 521 U.S. at 925.

An interpretation of federal law that requires state officials to assist federal agents in enforcing federal immigration law—including by forcing their properties to be used to federal ends—would run afoul of that anticommandeering principle. It would prevent state officials from "refus[ing] to comply with [a] request" to grant federal immigration officers unfettered access to state property. *Id.* at 909–10. And it would "command" state officers to assist in immigration enforcement by throwing open their doors. *Id.* at 935. Such requirements "would plainly

15

conscript state [] officers to expend state time and resources, for instance, to grant ICE agents access to 'non-public areas' and 'non-public entrances,' in order to help ICE enforce the federal civil immigration laws." *United States v. New York*, 810 F. Supp. 3d 329, 355 (N.D.N.Y. 2025), *appeal docketed*, No. 26-104 (2d Cir. Jan. 16, 2026).

Indeed, every court to consider this issue—including this Court—has held that the Federal Government cannot constitutionally prevent States from issuing rules that govern their officials' voluntary participation in immigration operations. *See, e.g.*, *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019) ("California has the right, pursuant to the anticommandeering rule, to refrain from assisting with federal efforts."); *United States v. Illinois*, 796 F. Supp. 3d 494, 523 (N.D. Ill. 2025) (allowing federal law to "control whether and how" state and local employees "share information with the [F]ederal [G]overnment" would violate anticommandeering because the States could not "affirmatively opt-out of enforcing federal immigration laws"), *appeal docketed*, No. 25-2904 (7th Cir. Oct. 27, 2025); *County of Ocean v. Grewal*, 475 F. Supp. 3d 355, 378–79 (D.N.J. 2020) (same), *aff'd sub nom. Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of N.J.*, 8 F.4th 176 (3d Cir. 2021); *City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 951–52 (N.D. Cal. 2018) (same), *aff'd in part, vacated in part on other grounds sub nom. City & Cnty. of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020). It might well be easier for the Federal Government if Congress could simply require state officials to assist with immigration enforcement, just as it would be easier if Congress could require state officers to perform firearms background checks. Both

16

are unconstitutional. *Printz*, 521 U.S. at 935; *see also Galarza v. Szalczyk*, 745 F.3d 634, 644 (3d Cir. 2014) (holding "immigration officials may not compel state and local agencies to expend funds and resources to effectuate a federal regulatory scheme"). New Jersey "has the right, pursuant to the anticommandeering rule, to refrain from assisting with federal efforts." *California*, 921 F.3d at 891.

The Federal Government cannot sidestep this bedrock anticommandeering rule by framing its desire for special access as a demand for state cooperation. *See* Compl. ¶¶ 55–57 (complaining that EO12 prevents state officials from "cooperating with federal immigration agents for the purpose of civil immigration enforcement"); *id.* ¶ 61 (complaining that EO12 prevents state officials from "facilitating federal enforcement of civil immigration law"). Forcing cooperation is merely another phrase for commandeering. And where state law chooses to "restrict certain federal activities" on its properties, it "does so only as part of implementing [that State's] permissible choice not to participate in federal civil immigration enforcement." *New York*, 810 F. Supp. 3d at 354.

The Federal Government's demand also runs headlong into anticommandeering principles another way. The Federal Government never denies that individual state officials can refuse warrantless entry to immigration officers on state property. But that authority did not become unlawful just because EO12 directed state officials how to exercise their discretion. As the Ninth Circuit explained, if state officers can make a "lawful decision not to assist federal authorities," then that decision cannot be "made unlawful when it is codified as state law" without violating anticommandeering principles. *California*, 921 F.3d at

17

890. Put another way, if the security guard can deny consent, then her manager can instruct her to deny consent, a cabinet official can set a policy of denying consent for all buildings in her agency, and the Chief Executive can set a policy of denying consent for all buildings in the Executive Branch. A contrary rule would contravene the "working assumption that federal legislation threatening to trench on the States' arrangements for conducting their own governments should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its own power." *Nixon v. Mo. Mun. League*, 541 U.S. 125, 140 (2004). Bluntly, commandeering state property into federal service is unconstitutional enough. But demanding that a State must control access to nonpublic areas of its own buildings through the security officer rather than the Chief Executive is a profound offense to sovereignty too. Certainly the Federal Government would not countenance that result for itself. The Federal Government's view is thus doubly unconstitutional.

## B.    The INA Does Not Preempt EO12.

With or without the canon of constitutional avoidance, the Federal Government's preemption claim also fails on its own terms. "Because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly preempt" state law. *Pennsylvania v. Navient Corp.*, 967 F.3d 273, 288 (3d Cir. 2020). That presumption is at its strongest when Congress has legislated "in a field which the States have traditionally occupied" or when States have exercised their "historic police powers." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *Navient*, 967 F.3d at 288 (same).

18

This case—concerning the Governor's direction to state officials on how to make state property safe for New Jerseyans—implicates both. States have always had plenary control of their own personnel and property. *See Adderley v. Florida*, 385 U.S. 39, 47 (1966) ("The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."); *Joyner v. Mofford*, 706 F.2d 1523, 1531 (9th Cir. 1983) (noting that States have "plenary power over state officials"). And "[t]hroughout our history the several States have exercised their police powers to protect the health and safety of their citizens," as New Jersey is doing for its residents who traverse state property. *Medtronic*, 518 U.S. at 475. That means the Federal Government has a tall task to prove preemption. Because there is a "basic assumption that Congress did not intend to displace state law," *Transource Pa., LLC v. DeFrank*, 156 F.4th 351, 373 (3d Cir. 2025), the federal "statute must reflect that preemption is the clear and manifest purpose of Congress," *Fed. L. Enf't Officers Ass'n v. Att'y Gen. N.J.*, 93 F.4th 122, 133–34 (3d Cir. 2024) (*FLEOA*).

Importantly, courts "rely on traditional tools of statutory interpretation to discern" Congress's preemptive intent "in enacting the federal law at issue." *FLEOA*, 93 F.4th at 133. So "all preemption arguments must be grounded in the text and structure of the federal statute at issue." *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 463 (3d Cir. 2021). "Invoking some brooding federal interest" is not enough. *Garcia*, 589 U.S. at 202. But here, nothing about the text and structure of Plaintiff's cited statutory provisions demonstrates Con-

19

gress's "clear and manifest" intent to preempt state actions (like EO12) governing whether state officials allow access to state property. And even were "some brooding federal interest" from immigration law enough, the Federal Government's own allegations are insufficient there too.

### 1.    EO12 Does Not Conflict With The INA's Text And Structure.

EO12 does not prevent the effectuation of the INA's text and structure. The Federal Government's statutory sources generally fall into three categories: (1) provisions about state and local cooperation in federal immigration enforcement, *see* 8 U.S.C. §§ 1373(a)–(b), 1644, 1357(g)(10); (2) provisions prescribing federal immigration agents' own authorities and duties, *see* 8 U.S.C. §§ 1226(c), 1231(a)(1)(B)(iii), (a)(4), 1227, 1228, 1225(b), 1226a, 1182, 1103(a)(3); 8 C.F.R. § 287.7; and (3) provisions that criminalize obstructing federal immigration operations, *see* 18 U.S.C. §§ 372, 1071; 8 U.S.C. § 1324(a)(1)(A)(iii). Each category fails for independent but interrelated reasons.

As to the first category—provisions about state and local cooperation in immigration enforcement—preemption falters out of the gate. Because the Constitution only confers "upon Congress the power to regulate individuals, not States," a "federal statute that does not regulate private actors cannot serve as a basis for preemption." *Ocean Cnty.*, 8 F.4th at 181–82. That proved dispositive in the Federal Government's challenge to the Immigrant Trust Directive, *id.*, and it proves dispositive for these statutes as well.

20

Start with § 1373 and § 1644. Those provisions essentially say that States cannot restrict government officials from sharing immigration information with federal authorities. *See* 8 U.S.C. §§ 1373, 1644. Yet the Third Circuit has already held that "neither § 1373 nor § 1644 regulates private actors," which is "fatal" to any preemption claim. *Ocean Cnty.*, 8 F.4th at 181–82 ("This is a clear prohibition on state action; it says nothing about private actors, so it cannot be fairly read to regulate them."); *Illinois*, 796 F. Supp. 3d at 521 (collecting cases). And in any event, denying access to nonpublic areas of state property is in no way a command not to provide "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373. So even if it regulated private actors, it has no bearing on a law like EO12.

Section 1357(g)(10) is even flimsier. Part of a section about federal-state cooperative agreements, this provision merely notes that no formal agreement is needed for States to voluntarily share information or cooperate with federal authorities in immigration enforcement. 8 U.S.C. § 1357(g)(10). Far from regulating private actors, this provision does not regulate anyone at all; it merely explains how a subsection about formal federal-state agreements "shall be construed." *Id.*; *see, e.g.*, *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("Section 1357 does not require cooperation at all."). And if it is directed at anyone, it is directed at the States, making clear they are free to aid in immigration enforcement as they wish. That includes the freedom for States to decide *who* can make that decision on behalf of the State; Section 1357 in no way bars the Governor—as head of New Jersey's Executive Branch—from supervising her

21

subordinates in their interactions with federal immigration officers. So § 1357(g)(10) also "cannot serve as a basis for preemption." *Ocean Cnty.*, 8 F.4th at 181–82.

The second category—provisions outlining the applicability of the INA and the duties of federal immigration officers—cannot support this preemption claim either. Those provisions merely explain which noncitizens should be detained or removed and when. 8 U.S.C. §§ 1225(b), 1226(c), 1226a, 1227, 1228, 1231(a). And they allow federal agents to issue immigration detainers asking States and localities to release noncitizens into federal custody. 8 U.S.C. §§ 1226(c); 8 C.F.R. § 287.7; *see also Galarza*, 745 F.3d at 642 n.9 (responding to immigration detainers is "permissive, not mandatory"). But the INA says nothing about *how* those duties are to be executed, let alone that they should be carried out by entering nonpublic spaces of state property. The statute is "silent as to whether civil immigration [enforcement] may take place in state facilities where a State has exercised its sovereign prerogative in restricting the use of its facilities for such activities." *New York*, 810 F. Supp. 3d at 349.

That is notable because Congress knows how to tell federal agents they can access certain property when it wants them to. By statute, for example, immigration officers can conduct warrantless searches on various modes of transportation "within a reasonable distance from any external boundary of the United States" and can gain warrantless access to "private lands, but not dwellings" within "twenty-five miles from any such external boundary." 8 U.S.C. § 1357(a)(3). Conspicuously absent from that list is any mention of state property

22

or, for that matter, any property in the interior United States. And "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *City & Cnty. of San Francisco v. EPA*, 604 U.S. 334, 344 (2025).

Taken together, then, federal law at most provides "states and localities the *option*, not the *requirement*, of assisting federal immigration authorities" by opening their doors. *California*, 921 F.3d at 889–90; *County of Ocean*, 475 F. Supp. 3d at 380 (explaining that § 1226 and § 1231(a)(1) "impose obligations solely on the federal government" and contain no "implied[] mandate[] that state and local governments" must "act in accordance with [them]"). And where, as here, federal law does not demand state compliance, merely "[d]eclining an option offered by a federal statute cannot create a conflict for preemption purposes." *Illinois*, 796 F. Supp. 3d at 527, 529–31; *California*, 921 F.3d at 890 (same); *McHenry County v. Raoul*, 44 F.4th 581, 592 (7th Cir. 2022) (same); *United States v. New Jersey*, No. 20-1364, 2021 WL 252270, at *8 (D.N.J. Jan. 26, 2021).

As to the third and final category—provisions that criminalize obstructing federal immigration operations—the Federal Government does nothing more than recite those provisions. *See* 18 U.S.C. §§ 372 (conspiracy to impede lawful discharge of official duties), 1071 (harboring or concealing a person "for whose arrest a warrant or process has been issued"); 8 U.S.C. § 1324(a)(1)(A)(iii) (harboring or concealing aliens who are in the United States in violation of law). It makes no effort to explain how, for example, state officials who merely close off

23

nonpublic areas of state property are "knowing[ly]" or "reckless[ly]" harboring "an alien [who] has come to, entered, or remains in the United States in violation of law." 8 U.S.C. § 1324(a)(1)(A)(iii). Courts have routinely bypassed such conclusory allegations. *See Illinois*, 796 F. Supp. 3d at 530 n.19 (Federal Government failed to adequately plead that state policies prohibiting ICE from accessing individuals in state custody somehow amounted to criminal unlawful harboring under 8 U.S.C. § 1324, let alone any affirmative interference in immigration enforcement at all); *United States v. New York*, 814 F. Supp. 3d 266, 280 (N.D.N.Y. 2025) (Federal Government failed to adequately plead that state law limiting access to DMV information constituted harboring in violation of § 1324). This Court should do the same.[4]

At bottom, the Federal Government cannot show that the INA's text and structure—which does not mention state property—"reflect[s] that preemption is the clear and manifest purpose of Congress." *FLEOA*, 93 F.4th at 133–34. So, commandeering aside, Plaintiff's preemption claim fails on its own terms.

---

[4] In any event, it bears repeating that these criminal provisions—like all the provisions cited in the Complaint—run headlong into the anticommandeering doctrine because federal law cannot require state officials to provide unfettered access to state property. *See supra* Section II.A. In fact, any state officials prosecuted for exercising their discretion under EO12 would likely assert (and win) an anticommandeering defense. *See Bond v. United States*, 564 U.S. 211, 225 (2011) (individuals may raise federalism arguments as a defense to prosecution); *cf. Trump v. United States*, 603 U.S. 593, 634 (2024) (explaining that "Congress may not criminalize" conduct it does not have the constitutional power to regulate). Plaintiff's assertion that a state employee commits a *federal crime* by failing to adequately assist federal officers is nothing more than an unconstitutional effort to "conscript[] state officers." *Printz*, 521 U.S. at 924–25.

**2.    The Complaint Also Fails To Allege That EO12 Actually Interferes With Immigration Enforcement.**

Between the anticommandeering doctrine and the lack of clear preemptive intent in the text and structure of the INA, this Court has two independent paths to reject this preemption claim. But there is also a third: the Federal Government does not adequately plead that EO12 "impede[s] the federal immigration agents' ability to engage in civil immigration enforcement." Compl. ¶ 72. To be clear, the Court should not even consider that "brooding federal interest" as a basis for preemption. *Garcia*, 589 U.S. at 202. In the Supreme Court's words: "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." *Id.* at 212. But in the alternative, if the Court does use this incorrect framework, these allegations are nonetheless deficient.

To start, EO12 does not affect the Federal Government's ability to access federal, county, municipal, or private property for immigration enforcement. *See* EO12 ¶¶ 1.a. Federal immigration officers can also use public areas of state property and even nonpublic areas of state property if they simply obtain a judicial warrant. *See id.* ¶¶ 2–3, 5.c. So EO12 indisputably leaves all property available to conduct immigration operations in at least some circumstances. Yet the Complaint nowhere explains why using the areas left undisturbed by EO12 would somehow thwart immigration enforcement. Nor does it explain why the Federal Government is unable to obtain judicial warrants if it wants unfettered access to state property. That is enough to find Plaintiff's allegations insufficient on their face.

25

Digging deeper into the Complaint only reveals more inadequacies. The Federal Government complains that EO12 will hamper its immigration-enforcement operations in three primary ways: (1) restricting access to nonpublic areas of courthouses; (2) restricting access to nonpublic areas of correctional facilities to execute detainers; and (3) prohibiting federal immigration officers from using state property as a staging area, processing location, or operations base. Compl. ¶¶ 53–67. None are plausibly alleged.

As to courthouses, most courthouses are run by counties and municipalities, not the State. *See* N.J. Stat. Ann. § 2B:6-1(b) ("Each county shall provide suitable courtrooms, chambers, equipment and supplies necessary for the processing and decision of cases from that county in the Law Division and the Family Part of the Chancery Division."); *id.* § 2B:12-15 ("Suitable courtrooms, chambers, offices, equipment and supplies for the municipal court, its administrator's office and its violations bureau shall be provided by the municipality or by a county that has established a central municipal court."). So they are unaffected by the Governor's order. *See* EO12 ¶ 1.a. And while the Complaint indicates a preference for detaining individuals in nonpublic areas of courthouses, Compl. ¶ 56, it contains no allegations that public areas in courthouses, or areas "near" them, *id.* ¶ 55, would be insufficient.

As to correctional facilities and detainers, EO12 continues the preexisting (now codified) Immigrant Trust Directive. That Directive already restricts access to nonpublic state law-enforcement property without a judicial warrant. *See* P.L. 2026, c.5 §§ 3(c)(3), (d)(3). And the Directive—which is incorporated into

26

EO12—allows state officers to honor detainers when the detainee is, among other exceptions, charged with "a violent or serious offense." *Id.* §§ 3(c)(5)(a), (6)(a). So it is unclear how EO12 "thwart[s] ICE's ability to arrest dangerous criminals who are already in state custody through the use of immigration detainers." Compl. ¶ 58. Besides, States have no obligation to respond to detainers at all. *Galarza*, 745 F.3d at 642 n.9 (responding to detainers is "permissive, not mandatory"). It is thus difficult to understand how EO12 could inappropriately stymy a practice that need not occur in the first place.

Finally, as to the use of state property for large-scale immigration operations, the Complaint simply notes that immigration officers "regularly use state-owned property accessible to the public" for "staging, base operations, and processing." Compl. ¶ 64. But it nowhere alleges why federal, private, county, or municipal property would be inadequate for those tasks—or, for that matter, whether federal immigration officers had actually been using state properties instead of these other properties in the past. Nor does it even attempt to explain why the Federal Government cannot obtain a judicial order to conduct those operations on state property.

In the end, Plaintiff's preemption claim fails thrice over. Federal law cannot constitutionally force state officials to assist federal agents in enforcing federal immigration law, and thus should not be read to force state officials to do so. Commandeering and constitutional avoidance aside, the text and structure of the INA do not preempt EO12. And were the Federal Government's amor-

27

phous interest in immigration enforcement enough—which precedent forecloses—the Complaint's allegations are inadequate regardless. For any or all of these reasons, this Court should dismiss the preemption claim.

### III.    EO12 Does Not Violate Intergovernmental Immunity.

The Federal Government's two intergovernmental-immunity claims fare no better. Most Supremacy Clause claims turn on the preemptive effect of particular federal laws: "Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy*, 584 U.S. at 477. Intergovernmental immunity, by contrast, is a self-executing immunity that overrides state laws even when consistent with federal statutes.

But because that doctrine "is such a powerful constraint on [S]tates, basic federalism and separation-of-powers principles limit its application to the clearest state intrusions on federal sovereignty." *New York*, 810 F. Supp. 3d at 351 n.12. Intergovernmental immunity therefore only "prohibit[s] state laws that either regulate the United States directly or discriminate against the Federal Government or those with whom it deals." *United States v. Washington*, 596 U.S. 832, 838 (2022) (emphasis omitted). EO12 does neither. First, because the State is acting as a proprietor of its own property, intergovernmental immunity is inapplicable. A contrary conclusion would, once again, unconstitutionally commandeer New Jersey. Second, even if the State were acting as a regulator, both types of intergovernmental immunity fail on their own terms.

## A.     Intergovernmental Immunity Cannot Prohibit EO12.

As an initial matter, just as for preemption, intergovernmental immunity cannot apply to EO12 without raising grave constitutional concerns. "[A]s the owner of" its property, "the government—like private property owners—has the power to regulate conduct on its property." *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019).[5] EO12 is an exercise of that authority by the head of the Executive Branch that owns or operates all the relevant facilities: in directing state officials how to control state property, New Jersey "is acting as a proprietor, not a regulator." *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 205 (5th Cir. 2024); *New York*, 810 F. Supp. 3d at 352.

And intergovernmental immunity is wholly inapplicable when a State is not acting as a regulator. *See Washington*, 596 U.S. at 839 (explaining that doctrine only applies where a State "*regulates* the United States directly" or "*regulates*" federal actors "unfavorably on some basis related to their governmental

---

[5] This is true in a variety of constitutional contexts. *See, e.g.*, *Class*, 930 F.3d at 464 (upholding the government's ban on firearms on U.S. Capitol Grounds, because "the government—like private property owners—has the power to regulate conduct on its property"); *Adderley*, 385 U.S. at 47 (rejecting claim that petitioners "had a constitutional right to stay on the property," because "[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated"); *Kipke v. Moore*, 165 F.4th 194, 208–11 (4th Cir. 2026) (upholding Maryland's prohibition on concealed weapons on transit "owned and controlled by the State," because "Maryland acts in its proprietary capacity when it runs the MTA"); *United States v. Blumenthal*, 315 F.2d 351, 353 (3d Cir. 1963) (rejecting due process challenge against the Federal Government because it "act[ed] in it[s] proprietary rather than its governmental capacity," and thus "has the same absolute right as any other landlord to terminate a monthly lease").

29

status" (cleaned up) (emphases added)). As courts have held in this exact context, the State "is not attempting to regulate federal agents and it is not prohibiting the federal government from enforcing immigration law." *New York*, 810 F. Supp. 3d at 352. "[I]t is simply defining, as a proprietor, what activities are not permissible in state-owned facilities." *Id.*; *Texas*, 123 F.4th at 205–06 (no intergovernmental immunity where Texas was merely "assert[ing] its rights as an ordinary proprietor" to "prevent trespass" by federal immigration officers). As a categorical matter, "[s]uch conduct does not run afoul of the intergovernmental immunity doctrine." *New York*, 810 F. Supp. 3d at 352–53.

That is equally true for both types of intergovernmental immunity. When a State acts as a proprietor, there can be no "direct regulation" of the Federal Government because there is, by definition, no state regulation at all. *See Core-Civic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 321 (3d Cir. 2025) (defining direct regulation). And like every other proprietor, the State may exclude from its nonpublic premises anyone it wishes. *See, e.g.*, *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 150 (2021) (property owner's right to exclude is "universally held to be a fundamental element of the property right"); *Camfield v. United States*, 167 U.S. 518, 524 (1897) (explaining that "the government has, with respect to its own lands, the rights of an ordinary proprietor, to maintain its possession and to prosecute trespassers"). So a state proprietor is free to bar entry by the Federal Government (or anyone else) from its nonpublic properties as well.

A contrary rule would, again, unconstitutionally commandeer the State by forcing it as property owner to cooperate with—and put its property into the

service of—federal programs. As explained above, the Federal Government cannot "compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz*, 521 U.S. at 933; *see supra* Section II.A. Yet if the Governor cannot tell state officials that immigration officers are disallowed on certain state property when enforcing immigration law, then state officials are being forced to aid exactly such a federal regulatory program. And it would have the very consequences that the doctrine seeks to avoid, blurring accountability for the federal civil immigration operations now happening in state medical facilities or state workplaces or state Department of Children and Families-owned properties. In other words, a finding that EO12 "violates the doctrine of intergovernmental immunity would imply that" state officials cannot refuse "to assist" federal "enforcement efforts—a result inconsistent with the Tenth Amendment and the anticommandeering rule." *California*, 921 F.3d at 891.

Because EO12 simply directs state officials how to exercise their discretion over state property, it is New Jersey acting as a proprietor. And because the State is acting as a proprietor, intergovernmental immunity is inapplicable.

## B.    Intergovernmental Immunity Does Not Violate EO12.

Even if New Jersey were acting as a regulator, Plaintiff's intergovernmental-immunity claims would still fail because EO12 is neither directly regulating nor discriminating against the Federal Government.

31

1. **EO12 Does Not Directly Regulate The Federal Government.**

Intergovernmental immunity overrides state regulations that place "a prohibition or mandate on the federal government." *CoreCivic*, 145 F.4th at 321. As multiple courts have held, state directions to its own officials—even about dealings with immigration authorities—do not violate intergovernmental immunity. For example, the Seventh Circuit found that a state law prohibiting state agencies and localities from contracting with the Federal Government to house immigration detainees did not directly regulate the Federal Government—rejecting the arguments the Complaint makes here. *McHenry County*, 44 F.4th at 592–93. While "a consequence of the Act—*the* intended consequence of the Act—is that the Federal Government will not be able to use cooperative agreements to house immigration detainees in Illinois State or county facilities," the law "imposes no direct regulation on any federal official or agency" and instead "directly regulates only State and local entities and law enforcement." *Id.* Likewise, Illinois laws prohibiting state and local support of federal civil immigration activities—by honoring immigration detainers and warrants, providing release date information, or giving access to persons in custody—do not directly regulated the Federal Government. *See Illinois*, 796 F. Supp. 3d at 534–35; *County of Ocean*, 475 F. Supp. 3d at 385 (same). Again, while the laws "indirectly affect ICE's operations in Illinois, they directly regulate only state and local law enforcement entities." *Illinois*, 796 F. Supp. 3d at 535.

32

So too here. EO12 is not directed at the Federal Government at all. State officials could always refuse entry to immigration officers on state property; EO12 simply tells state officials how to exercise that discretion. *See McHenry County*, 44 F.4th at 592–93 (no intergovernmental immunity where, even before the state law was in effect, "local entities were free to withhold their cooperation or terminate existing agreements"); *County of Ocean*, 475 F. Supp. 3d at 385 (no intergovernmental immunity where a state directive "regulate[d] only the conduct of state and local law enforcement agencies"). Unsurprisingly, then, EO12 looks nothing like the types of state regulations found to violate intergovernmental immunity. It does not place "a prohibition or mandate on the federal government." *CoreCivic*, 145 F.4th at 321. It does not "prevent[] the federal government from choosing how and through whom it will carry out a core federal function." *Id.* at 325; *Illinois*, 796 F. Supp. 3d at 534–35. It does not require "state approval before charging the federal government" certain rates. *CoreCivic*, 145 F.4th at 326. And it does not "bar federal contractors from working within the state unless they meet certain qualifications."[6] *Id.*

---

[6] Tellingly, the Federal Government's brief to the Third Circuit in *CoreCivic* conceded that "New Jersey is free to make its own contracting decisions regarding whether its agencies and political subdivisions will house civil immigration detainees" without running afoul of intergovernmental immunity. Br. for United States as Amicus Curiae at 6–7, *CoreCivic Inc v. Governor of New Jersey, et al.*, No. 23-2598, ECF No. 67 (3d Cir. Mar. 20, 2024). So Plaintiff itself has recognized that when the State regulates its own properties' relationship with federal immigration authorities, it crosses no constitutional lines.

Nor does EO12 "substantially interfere with" federal functions. *Id.* at 327. A key indicator of substantial interference is where a State "bar[s] federal officials from exercising their discretion." *Id.* But federal officials never *had* discretion to enforce immigration law on state property in any way they want and in any area they want. Instead, the property remains the State's and thus subject to the State's proprietary interests. *See supra* Section III.A. Plus, as discussed above, immigration officers are left with numerous places to enforce immigration law. *See supra* Section II.B.2. They can do so on federal, private, county, and municipal property, which seems to be what they care about most. *See id.* (courthouses generally run by counties); *McHenry County*, 44 F.4th at 592–93 (no intergovernmental-immunity problem where Federal Government could still "house immigration detainees in its own facilities in Illinois or to contract with private parties"). And they can even do so on state property in the same areas as the general public, or in nonpublic areas with a judicial warrant. *See supra* Section II.B.2. Federal officers are not directly regulated by a law that governs state actors alone.

In the end, federal officers are not directly regulated by a law that governs state actors alone. EO12 "does not seek to control how [immigration] agents carry out their duties," even if it "might incidentally affect how [immigration] agents do their jobs." *Texas*, 123 F.4th at 206–07. Because the State is simply "seeking to preserve its *own* property," there is no intergovernmental-immunity problem. *Id.*

### 2.    EO12 Does Not Discriminate Against The Federal Government.

Even again assuming New Jersey is acting as a regulator, Plaintiff gets no more help from intergovernmental immunity's discrimination prong. "A state law discriminates against the Federal Government or its contractors if it singles them out for less favorable treatment, or if it regulates them unfavorably on some basis related to their governmental status." *Washington*, 596 U.S. at 839; *McHenry County*, 44 F.4th at 594 ("Differential treatment is critical to a discrimination-based intergovernmental immunity claim."). But differential treatment is permissible when it is "justified by significant differences between the two classes." *Davis v. Mich. Dep't of Treas.*, 489 U.S. 803, 816 (1989). That differential treatment must also "impose a burden on the federal government in the way the intergovernmental immunity doctrine considers problematic." *Illinois*, 796 F. Supp. 3d at 534. After all, "[s]ince the advent of the doctrine, intergovernmental immunity has attached where a [S]tate's discrimination negatively affected federal activities in some way." *California*, 921 F.3d at 881. This claim fails both: EO12 does not treat federal immigration officers less favorably than "similarly situated" entities and it does not actually burden federal immigration officers.

As to differential treatment, Plaintiff's claim fails because it "cannot identify any actors similarly situated to the federal government that receive more favorable treatment under the" state regulation. *McHenry County*, 44 F.4th at 594 (cleaned up); *New York*, 810 F. Supp. 3d at 353–54 (same). Certainly, the public

35

is not treated more favorably: under EO12, federal immigration agents can access the same areas of state property and use them in the same ways as any member of the public, even if the public could be considered similarly situated. *See* EO12 ¶ 5.e. And even assuming state and local law-enforcement officers get more favorable treatment under EO12, they are not similarly situated to federal immigration officers. Compl. ¶¶ 8, 13. The former enforce criminal law; the latter do not. That makes all the difference because "civil immigration operations and criminal law enforcement are not similarly situated." *New Jersey*, 2021 WL 252270, at *14. Instead, the Federal Government must "identify examples of similarly situated authorities (*i.e., civil law enforcement agencies*) that the State treats better than it does federal immigration authorities." *Id.* It cannot.

The other comparator suffers a similarly fatal flaw. The Federal Government suggests that EO12 is discriminatory because "officials working for the Federal Bureau of Prisons, Drug Enforcement Administration, Bureau of Alcohol, Tobacco, and Firearms, or the Federal Bureau of Investigations" are not "subjected to similar regulation." Compl. ¶ 57. But that "misapprehends the standard for discrimination." *Illinois*, 796 F. Supp. 3d at 534. "For a state law to unconstitutionally discriminate against the federal government, it must treat comparable classes of federal and *non-federal* employees differently, not different

36

classes of federal employees."[7] *Id.* Because the Complaint cannot identify any-one similarly situated to the Federal Government that receives more favorable treatment under EO12, the discrimination claim fails for that reason alone.

As to burden, the Federal Government's discrimination claim also fails because "intergovernmental immunity attaches only to state laws that discrimi-nate against the federal government and burden it in some way." *California*, 921 F.3d at 880. Most discrimination cases involve burdens like state-levied taxes or costs on the Federal Government. *See, e.g.*, *Washington*, 596 U.S. at 838–39 (in-validating state law that "[o]n its face" "imposes upon the Federal Government costs that state or private entities do not bear"). But nothing like that exists here. EO12 "simply decline[s] to ease the burden of civil immigration enforcement by" granting federal immigration officers certain access and use of state prop-erty. *Illinois*, 796 F. Supp. 3d at 534. Yet "the mere fact that the actions of the federal government are incidentally *targeted* by [a state regulation] does not mean that they are incidentally *burdened*;" "while the latter scenario might implicate intergovernmental immunity, the former does not." *California*, 921 F.3d at 880. So "[t]he State's refusal to cooperate in the immigration context—a possibility contemplated by the relevant federal statutes—does not constitute discrimina-tion against the federal government." *McHenry County*, 44 F.4th at 594 n.7. Were

---

[7] To be sure, it is generally true that "only the federal government is authorized to enforce civil immigration law." *New York*, 810 F. Supp. 3d at 353. But that simply means it is "doubtful that a comparator exists." *Illinois*, 796 F. Supp. 3d at 534. And the "mere fact that [a state regulation] touches on an exclusively federal sphere is not enough to establish discrimination." *McHenry County*, 44 F.4th at 594; *see New York*, 810 F. Supp. 3d at 354 (same).

it otherwise, the State's "participation in such efforts would no longer be voluntary," again raising commandeering concerns. *New Jersey*, 2021 WL 252270, at *13. So EO12's direction for state officials not to assist immigration officers by granting them certain access or use of state property does not impose a burden on the Federal Government sufficient to support unlawful discrimination.

## CONCLUSION

This Court should dismiss the Complaint with prejudice.

Dated: May 8, 2026

Respectfully Submitted,

JENNIFER DAVENPORT
ATTORNEY GENERAL OF NEW JERSEY

By:    /s/ *September R. McCarthy*
       September R. McCarthy
       Deputy Attorney General

38