**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Hon. Georgette Castner, U.S.D.J. |
| Plaintiff, | |
| v. | Civil Action No. 3:26-cv-01770-GC-JTQ |
| THE STATE OF NEW JERSEY; MIKIE SHERRILL, Governor of New Jersey, in her Official Capacity, | |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM IN
<u>OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................... 1

II. BACKGROUND ............................................................................................................ 2

    A. Federal Law ............................................................................................................ 2

    B. New Jersey Executive Order 12 ............................................................................ 6

    C. Procedural History ................................................................................................. 6

III. LEGAL STANDARD ................................................................................................... 7

IV. ARGUMENT ................................................................................................................ 8

    A. The United States Has Standing To Defend Its Sovereign Interests ................ 8

        1. The United States Has Sufficiently Pleaded An Injury In Fact .................... 8

        2. The United States Pleaded An Injury Fairly Traceable To Executive Order No. 12 .. 10

        3. The United States Pleaded An Injury That Is Redressable ........................ 13

    B. Executive Order No. Is Preempted By Federal Law ........................................... 14

        1. The INA Can Preempt Executive Order No. 12 ......................................... 16

        2. The INA Preempts Executive Order No. 12 ............................................... 19

            a. Executive Order No. 12 Poses An Obstacle To The Enforcement Of The INA .. 21

            b. The Complaint Sufficiently Alleges That Executive Order No. 12 Interferes With Immigration Enforcement ............................................................ 22

    C. Executive Order No. 12 Violates Intergovernmental Immunity ...................... 24

        1. Executive Order No. 12 Impermissibly Regulates The Federal Government ........... 25

        2. Executive Order No. 12 Impermissibly Discriminates Against The Federal Government ........................................................................................ 28

    V. CONCLUSION ...................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

Cases                                                                                                          Page(s)

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
   458 U.S. 592 (1982).................................................................................................... 9

*Altria Grp., Inc. v. Good*,
   555 U.S. 70 (2008)..................................................................................................... 19

*Antilles Cement Corp. v. Fortuno*,
   670 F.3d 310 (1st Cir. 2012)..................................................................................... 13

*Arizona v. United States*,
   567 U.S. 387 (2012)............................................................................................ *passim*

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015)................................................................................................... 9

*Ballentine v. United States*,
   486 F.3d 806 (3d Cir. 2007)...................................................................................... 7

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................................... 7

*California v. Superior Ct. of Cal.*,
   482 U.S. 400 (1987)................................................................................................. 16

*CoreCivic, Inc. v. Governor of New Jersey*,
   145 F.4th 315 (3d Cir. 2025) .............................................................................. *passim*

*Crosby v. National Foreign Trade Council*,
   530 U.S. 363 (2000)............................................................................................ 19, 20

*Crow Indian Tribe v. United States*,
   965 F.3d 662 (9th Cir. 2020) .................................................................................... 8

*Davis v. Elmira Sav. Bank*,
   161 U.S. 275 (1896).................................................................................................. 19

*Diamond Alt. Energy, LLC v. EPA*,
   606 U.S. 100 (2025).................................................................................................. 10

*Duquesne Light Co. v. EPA*,
   166 F.3d 609 (3d Cir. 1999)...................................................................................... 11

*Edye v. Robertson*,
   112 U.S. 580 (1884).................................................................................................. 15

*Ex parte Siebold,*
  100 U.S. 371 (1879).........................................................................................14

*FDA v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024).........................................................................................13

*Fiallo v. Bell,*
  430 U.S. 787 (1977).........................................................................................15

*Fong Yue Ting v. United States,*
  149 U.S. 698 (1893).........................................................................................15

*Freightliner Corp. v. Myrick,*
  514 U.S. 280 (1995).........................................................................................15

*Galvan v. Press,*
  347 U.S. 522 (1954).........................................................................................15

*GEO Grp., Inc. v. Newsom,*
  50 F.4th 745 (9th Cir. 2022) ...........................................................................27

*Federal Election Comm'n v. Adkins,*
  524 U.S. 11 (1998)...........................................................................................12

*Graves v. People of State of N.Y. ex rel. O'Keefe,*
  306 U.S. 466 (1939).........................................................................................25

*Gutierrez v. Saenz,*
  606 U.S. 305 (2025).........................................................................................12

*Hancock v. Train,*
  426 U.S. 167 (1976).........................................................................................25

*Hillman v. Maretta,*
  569 U.S. 483 (2013).........................................................................................20

*Hines v. Davidowitz,*
  312 U.S. 52 (1941).............................................................................. 15, 19, 22

*In Re Neagle,*
  135 U.S. 1 (1890)....................................................................................... 14, 25

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action,*
  678 F.3d 235 (3d Cir. 2012)...............................................................................7

*Kansas v. Garcia,*
  589 U.S. 191 (2020).........................................................................................21

iv

*Leslie Miller, Inc. v. Arkansas*,
  352 U.S. 187 (1956) ............................................................................................... 27

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ........................................................................................ *passim*

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ................................................................................................. 8

*Manchester v. Rzewnicki*,
  777 F. Supp. 319 (D. Del. 1991), *aff'd* 958 F.2d 362 (3d Cir. 1992) ......................... 7

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) .............................................................................................. 13

*McCulloch v. Maryland*,
  17 U.S. (4 Wheat.) 316 (1819) ....................................................................... *passim*

*McHenry Cnty. v. Kwame Raoul*,
  44 F.4th 581 (7th Cir. 2022) ............................................................................. 27, 28

*Medtronic, Inc. v. Lohr,*
  518 U.S. 470 (1996) .............................................................................................. 19

*Mortensen v. First Fed. Sav. & Loan Ass'n*,
  549 F.2d 884 (3d Cir. 1977) .................................................................................... 7

*Murphy v. NCAA*,
  584 U.S. 453 (2018) .............................................................................................. 16

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ................................................................................................ 11

*Nielsen v. Preap*,
  586 U.S. 392 (2019) ............................................................................................ 5, 6

*North Dakota v. United States*,
  495 U.S. 423 (1990) ............................................................................. 3, 25, 28, 29

*Ocean County Bd. of Comm'rs v. AG of State of N.J.*,
  8 F.4th 176 (3d Cir. 2021) ..................................................................................... 22

*Phillips v. Cnty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ..................................................................................... 7

*Ping v. United States*,
  130 U.S. 581 (1889) .............................................................................................. 15

*Printz v. United States,*
   521 U.S. 898 (1997)............................................................................................ 16, 19, 26

*Pub. Int. Res. Group of N.J., Inc. v. Powell Duffryn Terms., Inc.,*
   913 F.2d 64, 73 (3d Cir. 1990)........................................................................ 13

*Savage v. Jones,*
   225 U.S. 501 (1912)........................................................................................ 19

*Simon v. E. Ky. Welfare Rights Org.,*
   426 U.S. 26 (1976).......................................................................................... 11

*South Carolina v. Baker,*
   485 U.S. 505, 523 (1988)................................................................................ 24, 25

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016).......................................................................................... 8

*Tennessee v. Davis,*
   100 U.S. 257 (1879)........................................................................................ 3, 14

*United States v. Alabama,*
   691 F.3d 1269 (11th Cir. 2012) ...................................................................... 9

*United States v. California,*
   173 F.4th 1060 (9th Cir. 2026) ...................................................................... 18

*United States v. Colo. Sup. Ct.,*
   87 F.3d 1161 (10th Cir. 1996) ........................................................................ 8

*United States v. Ferrara,*
   847 F. Supp. 964 (D.D.C. 1993), *aff'd* 54 F.3d 825 (D.C. Cir. 1993) ...................................... 25

*United States v. King Cnty.,*
   122 F.4th 740 (9th Cir. 2024) ........................................................................ 18, 28, 29

*United States v. Missouri,*
   114 F.4th 980 (8th Cir. 2024), *cert. denied,* 146 S. Ct. 90 (2025)........................................ 8, 9

*United States v. Town of Windsor,*
   765 F.2d 16 (2d Cir. 1985)............................................................................. 25

*Vt. Ag'y of Nat. Res. v. U.S. ex rel. Stevens,*
   529 U.S. 765 (2000)........................................................................................ 9

*United States v. Washington,*
   596 U.S. 832 (2022)................................................................................*passim*

vi

**U.S. Constitution**

U.S. Const. art. I, § 8, cl. 3 ................................................................................................ 2

U.S. Const. art. I, § 8, cl. 4 ............................................................................................ 2, 15

U.S. Const. art. II § 3 ....................................................................................................... 2

U.S. Const. art. VI, cl. 2 ............................................................................................... 2, 16

**Federal Statutes**

8 U.S.C. § 1101 *et seq.* ................................................................................................... 3

8 U.S.C. § 1103(a)(3) ....................................................................................................... 4

8 U.S.C. § 1103(a)(11) ..................................................................................................... 3

8 U.S.C. § 1182 ............................................................................................................... 3

8 U.S.C. § 1225 ............................................................................................................... 3

8 U.S.C. § 1225(b) .......................................................................................................... 17

8 U.S.C. § 1226 ............................................................................................................. 3, 5

8 U.S.C. § 1226(a) ................................................................................................... *passim*

8 U.S.C. § 1226(c) ................................................................................................... *passim*

8 U.S.C. § 1226(d)(1)(A) ................................................................................................. 5

8 U.S.C. § 1227 ............................................................................................................... 3

8 U.S.C. § 1228 ............................................................................................................... 3

8 U.S.C. § 1229(e) .......................................................................................................... 23

8 U.S.C. § 1231 ............................................................................................................... 3

8 U.S.C. § 1231(a) ................................................................................................... *passim*

8 U.S.C. § 1231(a)(1)(B)(iii) ....................................................................................... 4, 21

8 U.S.C. § 1231(a)(4)(A) ................................................................................................ 20

8 U.S.C. § 1231(g) ........................................................................................................... 3

8 U.S.C. § 1324(a)(1)(A)(iii) ................................................................................ 5

8 U.S.C. § 1357(a)(2) ......................................................................................... 20

8 U.S.C. § 1357(d) ............................................................................................... 4

8 U.S.C. § 1357(g)(10)(A) ................................................................................... 5

**Federal Rules**

Federal Rule of Civil Procedure 12(b)(6) ........................................................... 7

Federal Rules of Civil Procedure 12(b)(1) .......................................................... 7

**Federal Regulations**

8 C.F.R. § 287.7 ..................................................................................... 22, 23, 27

8 C.F.R. § 287.7(a) .............................................................................................. 4

8 C.F.R. § 287.7(d) ......................................................................................... 4, 22

**Other Authorities**

ICE Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers*,
    § 2.4 (Mar. 24, 2017), https://www.ice.gov/sites/default/files/ documents/Document/
    2017/10074-2.pdf [https://perma.cc/ VQ38-U39G] ............................................. 3, 4

Immigration and Nationality Act of 1952, Pub. L. 82–414, ch. 477, 66 Stat. 163 (1952) ............. 3

N.J. Executive Order No. 12 ............................................................................ *passim*

## I.   INTRODUCTION

N.J. Executive Order No. 12 (Feb. 11, 2026) ("EO12") is a deliberate attempt by the State of New Jersey to impede federal immigration enforcement within its borders. Issued by Governor Mikie Sherrill on February 11, 2026, EO12 categorically bars federal immigration officers from nonpublic areas of state-owned property and prohibits the use of state property as a staging area, processing location, or operations base for civil immigration enforcement—unless officers first obtain a judicial warrant that Congress never required and that no other law enforcement agency must procure. EO12 identifies U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP") by name. State and local officers, and every other federal law enforcement agency retain unrestricted access to the same property. The differential treatment rests on a single characteristic: enforcement of federal immigration law.

The consequences are tangible. For example, Congress has mandated that certain criminal aliens be taken into federal custody upon release from state detention. 8 U.S.C. §§ 1226(c), 1231(a). EO12 bars federal officers from the facilities where those aliens are held at precisely the moment Congress prescribed for their transfer, and it does so by displacing the administrative warrants Congress expressly authorized for that purpose with a judicial warrant requirement of the State's own devising. EO12 also bars federal immigration officers from courthouses operated by New Jersey executive branch departments and agencies. Accordingly, what Congress built as an integrated handoff between state and federal custody, New Jersey has converted into a wall.

The U.S. Court of Appeals for the Third Circuit has held that under our constitutional framework of "dual sovereigns," states may not cross the line with state laws that "destroy" federal policy. *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 319 (3d Cir. 2025). "When [a state] crosses that line, it violates the Constitution." *Id.* Here, EO12 crosses the line, because it obliterates the carefully crafted cooperative framework forged by Congress to establish an

integrated handoff between state and federal custody of aliens. As in *CoreCivic*, this Court should "see the law for what 'it really is': a direct regulation on the federal government." *Id.* (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 431 (1819)).

Under its express terms, EO12 recognizes that federal access to state-owned property under a judicial warrant is permissible. This makes it clear that the objection is not to the access itself but, rather, is to the *form* of authorization. Rejecting administrative warrants as insufficient for access directly conflicts with federal policy to utilize tools to expedite the detention and removal process. That amounts to an expansion of state sovereignty at the expense of federal sovereignty.

For the reasons that follow, Defendants' Motion to Dismiss should be denied. The United States has standing—it has alleged concrete operational and sovereign injuries that are directly and unambiguously traceable to EO12 and fully redressable by injunctive relief. On the merits, EO12 is preempted as an obstacle to the comprehensive immigration enforcement scheme Congress enacted and violates the intergovernmental immunity doctrine by directly regulating and discriminating against the Federal Government based on its governmental function. Plaintiff United States opposes, and this Court should deny Defendants' Motion to Dismiss.

## II. BACKGROUND

### A. Federal Law

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

The Constitution affords Congress the power to "establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3. The President has a constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II § 3. Based on its enumerated constitutional and sovereign

powers to control and conduct relations with foreign nations, the Federal Government has broad authority to establish immigration laws, the execution of which the States cannot obstruct or take discriminatory actions against. *See Arizona v. United States*, 567 U.S. 387, 394-95 (2012); *accord North Dakota v. United States*, 495 U.S. 423, 435 (1990); *id.* at 444-47 (Scalia, J., concurring).

Congress has exercised its authority by enacting laws governing the entry, presence, status, and removal of aliens within the United States in various provisions of the Immigration and Nationality Act of 1952, Pub. L. 82–414, ch. 477, 66 Stat. 163 (1952) (codified at 8 U.S.C. § 1101, *et seq.*) ("INA"). These laws confer extensive authority on the Executive Branch to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or found to be, unlawfully in the United States. *See* 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231. They also direct the Executive Branch to arrange for appropriate detention locations for aliens pending removal or a decision on removal. *See, e.g.*, *id.* §§ 1103(a)(11), 1231(g). Responsibility for enforcing these laws is vested principally in the U.S. Department of Homeland Security ("DHS") and two of its component agencies: ICE and CBP. Because the authority to execute the laws "extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States," federal officers and agents "must act within the States," *Tennessee v. Davis*, 100 U.S. 257, 263 (1879) (stating that the Federal Government "can act only through its officers and agents").

Congress gave DHS several tools to fulfill its mission. For example, the INA expressly authorizes DHS to arrest and detain aliens pursuant to administrative warrants. *See* 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."). These administrative warrants "must establish probable cause to believe that the subject is an alien who is removable from the United States." ICE Policy No. 10074.2, *Issuance of Immigration Detainers*

3

*by ICE Immigration Officers*, § 2.4 (Mar. 24, 2017), https://www.ice.gov/sites/default/files/ documents/Document/2017/10074-2.pdf [https://perma.cc/ VQ38-U39G]**.**

In enacting the INA, Congress recognized that an alien who is subject to federal immigration proceedings may also be subject to confinement for state or local criminal law violations. Under those circumstances, the INA dictates that federal immigration officials generally "may not remove an alien who is sentenced to [state] imprisonment until the alien is released from [such] imprisonment." 8 U.S.C. § 1231(a)(4)(A). The INA further authorizes, and in some cases requires, federal immigration officials to assume custody immediately upon the alien's release from state or local custody. *See id.* §§ 1226(a), 1226(c).

If an alien DHS seeks is in the custody of another law enforcement agency, DHS may issue an "immigration detainer" to advise that agency that DHS seeks custody "for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a); *see also* 8 U.S.C. §§ 1103(a)(3), 1226(a), (c), 1231(a), 1357(d). An immigration detainer is "a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." 8 C.F.R. § 287.7(a). Immigration detainers must be accompanied by an administrative warrant, either an alien arrest warrant or a warrant of removal, signed by an ICE immigration officer. ICE Policy No. 10074.2, § 2.4. Once a detainer is issued to a local agency, "such agency *shall* maintain custody of the alien for a period not to exceed 48 hours." 8 C.F.R. § 287.7(d) (emphasis added).

To fulfill their duties, federal immigration officials rely on law enforcement partners across the country. *See Arizona*, 567 U.S. at 411 ("Consultation between federal and state officials is an important feature of the immigration system."). The INA reflects that expectation of collaboration, as several provisions of the statute regulate the way federal and state officials share information about aliens subject to both state criminal law enforcement and federal immigration enforcement.

For example, the Federal Government must make resources available to state and local authorities to aid in determining whether those they have arrested for aggravated felonies are aliens. 8 U.S.C. § 1226(d)(1)(A). The INA also directs the Federal Government to designate liaisons to "State[] and local law enforcement and correctional agencies . . . with respect to the arrest, conviction, and release of any alien charged with an aggravated felony[.]" *Id.* § 1226(d)(1)(B). And if state officials "seek[] to verify or ascertain the citizenship or immigration status of any individual," the Federal Government must share the requested information. *Id.* § 1373(c).

The INA similarly provides that federal, state, and local government entities and officials "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a); *see also id.* § 1644 (similar); *id.* § 1357(g)(10)(A) (providing that no formal agreement is required for a state or local official to communicate with immigration officials regarding the immigration status of any individual, including knowledge of unlawful presence).

Congress further sought to affirmatively penalize efforts to obstruct immigration enforcement by, among other things, prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation." *Id.* § 1324(a)(1)(A)(iii).

These laws promote public safety. Although "[a] principal feature of the removal system is the broad discretion exercised by immigration officials," *Arizona*, 567 U.S. at 396, Congress was concerned "that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers," *Nielsen v. Preap*, 586 U.S. 392, 398 (2019) (citation omitted). To address this, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, amending 8 U.S.C. § 1226 to mandate the detention of

5

certain aliens who, based on their commission of specified "predicate crimes," pose a threat to public safety. *See Nielsen*, 586 U.S. at 398 ("The categories of predicates for mandatory detention identified in subparagraphs (A)–[(E)] generally involve the commission of crimes.").

### B.  New Jersey Executive Order 12

On February 11, 2026, Governor Sherrill signed EO12 which requires that, absent a judicial warrant or order, "Executive Branch departments and agencies shall not permit or consent to federal immigration officers entering, accessing, or using nonpublic areas of State property for the purpose of facilitating federal enforcement of civil immigration law," EO12, § 2, or ". . . using State property as a staging area, processing location, or operations base for the purpose of facilitating federal enforcement of civil immigration law." *Id.* § 3.

EO12 defines "State property" as "facilities, premises, and parcels, or portions thereof, that are owned, operated, leased, or controlled by New Jersey Executive Branch departments and agencies, including but not limited to office buildings, parking lots, and parking garages," *Id.* § 1(a), and "Federal immigration officers" as "an agent of federal [ICE], federal [CBP], any similar agency or successor agency, or any other federal law enforcement agency tasked with civil immigration enforcement or working in concert with Immigration and Customs Enforcement or Customs and Border Protection." *Id.* § 1(c).

### C.  Procedural History

On February 23, 2026, Plaintiff filed a Complaint against the State of New Jersey and Governor Sherrill seeking declaratory and injunctive relief. Compl., *United States of America v. The State of New Jersey et al.*, No. 3:26-cv-01770 (D.N.J. Feb. 23, 2026) (ECF No. 1). The United States brought this action on the grounds that EO12 is preempted by federal law and that, under the intergovernmental immunity doctrine, EO12 impermissibly regulates and discriminates against the Federal Government, in violation of the Supremacy Clause of the Constitution. *Id.* Defendants

6

filed the present Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Defs. Mot. to Dismiss (ECF No. 10).

### III. LEGAL STANDARD

In considering a facial motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), which tests the sufficiency of the complaint as opposed to deciding the merits of the case, "Court[s] must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the nonmoving party." *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012) (citing *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007)); *see Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

Similarly, when considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotations omitted).

A claim will survive a motion dismiss when it is facially plausible, in other words, where the plaintiff pleads facts sufficient to raise a right to relief beyond mere speculation. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (allegations that "raise [the plaintiff's] right to relief above the speculative level" are adequate to survive a motion to dismiss). Importantly, dismissal is a "harsh remedy, to be used cautiously so as to promote the liberal rules of pleading and to protect the interests of justice." *Manchester v. Rzewnicki*, 777 F. Supp. 319, 324 (D. Del. 1991), *aff'd*, 958 F.2d 364 (3d Cir. 1992). The United States's allegations easily satisfy this standard, and Defendants' Motion should be denied.

## IV. ARGUMENT

### A.  The United States Has Standing To Defend Its Sovereign Interests

Defendants initially argue that the Federal Government lacks standing to bring this action. Br. of Defs. in Supp. of Mot. to Dismiss at 17 (ECF 10-1) ("Defs. Br."). "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum" of standing consists of three elements. *Id.* at 560. A plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). At the dismissal stage, general factual allegations of injury resulting from the defendant's conduct suffice, because the Court should "presume[] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). Here, the United States has plausibly alleged each element of standing in challenging EO12.

### 1.  *The United States Has Sufficiently Pleaded An Injury In Fact*

Defendants assert that the United States has not suffered an injury sufficient for standing. Defs. Br. at 18-19. To establish an injury in fact, the United States must show it suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical[.]" *Lujan*, 504 U.S. at 560 (citations omitted). "The United States has a legally protected interest in enforcing federal law." *United States v. Missouri*, 114 F.4th 980, 984-85 (8th Cir. 2024), *cert. denied*, 146 S. Ct. 90 (2025) (citing *United States v. Colo. Sup. Ct.*, 87 F.3d 1161, 1165 (10th Cir. 1996), and *Crow Indian Tribe v. United States*, 965 F.3d 662, 676 (9th Cir. 2020)). Under the Supremacy Clause, "the states are prohibited from passing any acts which shall be repugnant to a law of the United States." *McCulloch*, 17 U.S. (4 Wheat.) at 361. While there is no right of action under the Supremacy Clause, there is an equitable

8

tradition of suits to enjoin unconstitutional actions by state actors for violations of the United States' sovereignty. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

The Federal Government has cognizable "sovereign interests" not only in its "power to create and enforce a legal code, both civil and criminal[,]" but also in "recognition [of that code] from other sovereigns[.]" *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982); *Arizona*, 567 U.S. at 398 ("Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect.").

The United States suffers sovereign harm when a state legislates in violation of federal law and the Supremacy Clause. *See Vt. Ag'y of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000) (stating that "[i]t is beyond doubt" that a complaint "asserts an injury to the United States" if it alleges an "injury to [U.S.] sovereignty arising from violation of its laws."); *Missouri*, 114 F.4th at 985 ("Interference with the federal government's interest in enforcing federal law is sufficient to establish that the Act's implementation injured the United States."); *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations.").

The United States suffers a traditional concrete injury as well: federal immigration officers are compelled to carry out their congressionally mandated duties in a more dangerous manner that conflicts with the methods federal law both authorizes and requires. *See, e.g.*, Compl. ¶¶ 11, 49, 56, 72. Prior to EO12, federal immigration officials carried out those duties by relying on cooperation between state and federal law enforcement but must now operate in a less safe environment to accomplish those same duties. For example, prior to EO12, agents would utilize non-public areas of courthouses to minimize safety concerns, while now they cannot. Compl. ¶¶ 56-57. In the context of a motion to dismiss, the injury alleging heightened safety concerns to

9

federal immigration agents in areas accessible to the general public are to be treated as true. *See, e.g., Lujan*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'").

And although Defendants contend that "EO12 expressly governs only state employees" and does not prohibit the actions of federal immigration officers, Defs.' Br. at 18-19, there is no third-party problem here. Defendants are directly targeting and regulating the United States, directly creating an obstacle to its immigration enforcement, and facially discriminating against federal immigration officers. Compl. ¶¶ 71-72, 76-78, 81. But whether EO12 violates the Supremacy Clause and intergovernmental immunity doctrine are merits questions, not jurisdictional ones. *See* Defs. Br. at 19 (citing its merits argument from Section III.B.1).

In any event, the United States has plausibly alleged injury in fact sufficient to establish standing to challenge EO12 because Defendants here are directly targeting the Federal Government through EO12. That act of targeting alone is sufficient to provide standing. *See Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 125 (2025) ("The government generally may not target a business or industry through stringent and allegedly unlawful regulation, and then evade the resulting lawsuits by claiming that the targets of its regulation should be locked out of court as unaffected bystanders."); *see also id.* at 114 ("[w]hen a plaintiff is the 'object' of a government regulation, there should 'ordinarily' be 'little question' that the regulation causes injury to the plaintiff and that invalidating the regulation would redress the plaintiff's injuries.").

### 2. *The United States Pleaded An Injury Fairly Traceable To Executive Order No. 12*

An injury is fairly traceable when there is "a causal connection between the injury and the conduct complained of . . . and not the result of the independent action from some third party not before the Court." *Lujan*, 504 U.S. at 560 (citation modified).

10

Defendants argue that the United States "cannot establish that a lack of access to these properties is traceable to EO12[,]" and that "courts routinely reject standing if regulated parties might take the same action anyway." Defs. Br. at 19 (citing *Murthy v. Missouri*, 603 U.S. 43, 73 (2024); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42-43 (1976); *Duquesne Light Co. v. EPA*, 166 F.3d 609, 613 (3d Cir. 1999)). This argument fails because EO12 instructs state employees to deny access to federal immigration officials. The harm here is not whether these state employees will or will not comply with EO12; rather, the harm is the denial-of-access instruction itself, which is directly traceable to EO12 because the harm is embodied within the text of EO12.

Moreover, the cases cited by Defendants—*Murthy*, *Simon*, and *Duquesne Light*—each involved a causal chain running through the independent choices of third parties not before the court. In *Murthy*, the alleged censorship depended on whether non-party private social media platforms would act on government communications. *Murthy*, 603 U.S. at 72. In *Simon*, the plaintiffs' injury depended on whether private hospitals, not the defendant IRS officials, would change their conduct in response to a tax ruling. *Simon*, 426 U.S. at 42-43. And in *Duquesne Light*, the loss of emissions credits turned on the independent regulatory decisions of a state agency. *Duquesne Light*, 166 F.3d at 613. In each case, the causal chain was broken by an autonomous third-party actor whose choices the court could not control or predict.

None of that is present here. The United States' injury does not depend on the intervening choices of any third party. Rather, EO12 operates directly on New Jersey executive branch departments and agencies and commands them, by its express terms, to deny federal immigration officers' access to nonpublic areas of state property and to prohibit use of state property as a staging area, processing location, or operations base. Compl. ¶¶ 5-7. There is no independent actor in the causal chain. Further, the harm in EO12 is EO12 itself, and its harmful effect on the United States is immediate and direct. Compl. ¶¶ 10, 57, 63.

11

Moreover, Defendants argue that the United States has not plausibly alleged that "even absent EO12, state employees would allow the same federal immigration officers the unfettered access to the state properties that they want." Defs. Br. at 19-20. To be clear, the United States is not required to plead a counterfactual where EO12 does not exist. *See Lujan*, 504 U.S. at 560. It requires only that the challenged conduct be a cause of the alleged injury. The United States has alleged that EO12 categorically prohibits federal immigration officers from certain access and use of state property. Compl. ¶¶ 5-7. The injury is the prohibition itself, not what individual state employees might have done absent it. Compl. ¶ 49. Defendants' framing would effectively immunize from judicial review any state restriction that could theoretically have been replicated through the voluntary choices of individual officials. That is not and should not be the law.

Even so, speculating about the future decisions of what New Jersey state employees might do in the future is not determinative of the standing analysis here. For example, in *Gutierrez v. Saenz*, 606 U.S. 305 (2025), the Supreme Court observed, "That a prosecutor might eventually find another reason, grounded in Article 64 or elsewhere, to deny a prisoner's request for DNA testing does not vitiate his standing to argue that the cited reasons violated his rights under the Due Process Clause." *Id.* at 320 (citing *Federal Election Comm'n v. Akins*, 524 U.S. 11, 25, (1998) ("[T]hose adversely affected by a discretionary agency decision generally have standing to complain that the agency based its decision upon an improper legal ground . . . even though the agency . . . might later, in the exercise of its lawful discretion, reach the same result for a different reason"); *Lujan*, 504 U.S. at 572, n. 7 (1992) ("[U]nder our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered . . . .")).

12

Accordingly, the injuries the United States has pleaded in this case are traceable because they flow directly and immediately from EO12's express terms.

**3.  *The United States Pleaded An Injury That Is Redressable***

For an injury to be redressable, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561. As the Supreme Court has explained, "[t]he second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (citation omitted). Therefore, "[i]f a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id.* at 381. Redressability does not require that a favorable judgment eliminate the injury entirely, only that it would likely redress it "at least in part." *Pub. Int. Res. Group of N.J., Inc. v. Powell Duffryn Terms., Inc.*, 913 F.2d 64, 73 (3d Cir. 1990), *cert. denied*, 498 U.S. 1109 (1991) ("Where a plaintiff complains of harm to water quality because a defendant exceeded its permit limits, an injunction will redress that injury at least in part. If PDT complies with its permit, the pollution in the Kill Van Kull will decrease. Plaintiffs need not show that the waterway will be returned to pristine condition in order to satisfy the minimal requirements of Article III."); *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 318 (1st Cir. 2012) ("[A party] need only show that a favorable ruling could potentially lessen its injury; it need not definitively demonstrate that a victory would completely remedy the harm."). As the Supreme Court reaffirmed in *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007), if the injury can be redressed "to some extent," then a plaintiff has met the redressability prong for standing.

Defendants' own concession resolves the redressability question. Defendants acknowledge that state officials retain discretion to grant or deny entry to federal immigration officers. Defs. Br. at 20. Accordingly, the United States' injury is, at least, partially redressable and therefore

sufficient for standing. If the discretion Defendants invoke runs in one direction—permitting state officials to deny entry—it necessarily runs in the other. Officials who are free to exclude federal immigration officers are equally free to admit them. An injunction against EO12 would restore that discretion, freeing state officials to grant access on a case-by-case basis.

Defendants' speculation that state officials would continue to refuse entry even if EO12 were enjoined fares no better. Defs. Br. at 20-21. At the pleading stage, the redressability inquiry asks whether it is likely, not certain, that a favorable judgment would redress the injury. *Lujan*, 504 U.S. at 561. Moreover, if the mere possibility that state officials might exercise their discretion to deny access were sufficient to defeat redressability, no plaintiff could ever establish standing to challenge a state directive that operates through state personnel. *See generally id.* Here, a permanent injunction prohibiting Defendants from enforcing the challenged EO12 will redress the United States's injury as it would eliminate the categorical, mandatory prohibition that currently forecloses any possibility of access by federal immigration officers.

Certainly, an order enjoining enforcement of EO12 would beneficially impact the safety for Federal personnel, detainees, and the public as arresting and detaining aliens in a custodial setting presents fewer risks than at-large arrests. Compl. ¶¶ 60-61. In this respect, the injury caused by EO12 has adversely impacted the Federal Government and is immediately redressable.

**B. Executive Order No. 12 Is Preempted By Federal Law**

Ever since the creation of the Union, it has been "an incontrovertible principle[] that the government of the United States may . . . execute on every foot of American soil the powers and functions that belong to it." *Ex parte Siebold*, 100 U.S. 371, 395 (1879). "The United States is a government with authority extending over the whole territory of the Union, acting upon the States and the people of the States." *In re Neagle*, 135 U.S. 1, 62 (1890) (quoting *Davis*, 100 U.S. at 263).

14

Though "limited in the number of its powers, so far as its sovereignty extends[,] it is supreme." *Id.* (quoting *Davis*, 100 U.S. at 263).

"[O]ver no conceivable subject is the" federal power "more complete," and thus more supreme, "than it is over" immigration. *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quotations omitted). "[T]he supremacy of the national power in the general field of foreign affairs, including power over immigration, naturalization and deportation, is made clear by the Constitution." *Hines v. Davidowitz*, 312 U.S. 52, 62 (1941). It is manifest in Congress's authority to "establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, implicit in provisions like the Foreign Commerce Clause, *see Edye v. Robertson*, 112 U.S. 580, 591-592 (1884), and inherent in the status of the United States as a sovereign, *see, e.g.*, *Ping v. United States*, 130 U.S. 581, 604 (1889). It is a "national matter[ ] . . . entrusted to the government of the Union." *Id.* at 605-606. As a result, "Congress[ ] ha[s] the right, as it may see fit, to expel aliens of a particular class, or to permit them to remain," and likewise "has undoubtedly the right . . . to take all proper means to carry out the system which it provides." *Fong Yue Ting v. United States*, 149 U.S. 698, 714 (1893); *see, e.g.*, *Galvan v. Press*, 347 U.S. 522, 530 (1954) ("The power of Congress over the admission of aliens and their right to remain is necessarily very broad, touching as it does basic aspects of national sovereignty, more particularly our foreign relations and the national security.").

EO12 flouts those principles and undermines how the Executive Branch enforces Congress's determination that certain aliens must be taken into custody, detained, and removed. Thus, EO12 is invalid under the Supremacy Clause for two reasons: *first*, it is preempted, because it stands as an obstacle "to the accomplishment and execution of the full purposes and objectives of Congress," which are reflected in laws directing DHS to take custody of criminal aliens after their state custody ends, detain them as necessary or required, and remove them if found removable. *See Hines*, 312 U.S. at 67; *see also Freightliner Corp. v. Myrick*, 514 U.S. 280, 287

15

(1995); *second*, EO12 improperly regulates the Federal Government and "discriminate[s] against the Federal Government." *See CoreCivic*, 145 F.4th at 319; *United States v. Washington*, 596 U.S. 832, 838 (2022).

### 1.  *The INA Can Preempt Executive Order No. 12*

The Constitution establishes a system of "dual sovereignty," in which the Federal Government and the States both wield sovereign powers. *See Murphy v. NCAA*, 584 U.S. 453, 458 (2018). Under that system, while the Federal Government lacks the "power to issue orders directly to the States," *id.* at 470, there are "certain limits on the sovereign powers of the States, limits that are an essential part of the Framers' conception of national identity and Union," *California v. Superior Ct. of Cal.*, 482 U.S. 400, 405 (1987).

The Constitution also grants enumerated powers to Congress, *see* art. I, § 8, and confirms that powers not granted to Congress are reserved for the States, *see* U.S. Const. amend. X. Under the Tenth Amendment, Congress must exercise its legislative power over individuals directly and may not commandeer States into enacting a federal regulatory program. *See Murphy*, 584 U.S. at 472. But when Congress exercises its enumerated powers to regulate individuals, the States cannot stand in the way. U.S. Const. art. VI, cl. 2. Under the Supremacy Clause, "when federal and state law conflict, federal law prevails and state law is preempted." *Murphy*, 584 U.S. at 471.

Defendants erroneously characterize their obstruction of federal immigration enforcement, *see* Defs. Br. at 22-26, as their prerogative under the Tenth Amendment. The anticommandeering doctrine prevents Congress from "compel[ling] the States to enact or enforce a federal regulatory program," or "circumvent[ing] that prohibition by conscripting the State's officers directly." *Printz v. United States*, 521 U.S. 898, 935 (1997); *Murphy*, 584 U.S. at 473. By preventing the Federal Government from commandeering the States, the Tenth Amendment thus serves as "one of the

16

Constitution's structural protections of liberty," "promotes political accountability," and "prevents Congress from shifting the costs of regulation to the States." *Murphy*, 584 U.S. at 473.

Defendants, however, fundamentally mischaracterize the relief that the United States seeks. The United States does *not* ask this Court to compel state officers to affirmatively implement federal immigration law. Compl. ¶ 20 (requesting a permanent injunction prohibiting Defendants from enforcing or implementing the challenged EO12). Rather, the Federal Government asks the Court for a return to the status quo before EO12 and to compel state officers to respect the framework of "dual sovereignty" established in the U.S. Constitution and to not sabotage federal policy simply because "[i]t dislikes some of the federal government's immigration tools." *CoreCivic*, 145 F.4th at 319. If there was no Tenth Amendment concern prior to EO12, how can that concern exist now if the parties are simply returned to the status quo that existed before EO12?

EO12 is doubly harmful in that it prevents the Federal Government from accessing aliens subject to detention under the INA, *see* 8 U.S.C. §§ 1225(b), 1226(c), 1231(a), and it precludes the Federal Government from making arrests when detainees should be transferred from state custody to federal custody in accordance with the cooperative federal-state scheme Congress carefully constructed to facilitate that detention. *See id.* ¶¶ 12, 27, 29, 57; *see, e.g., id.* § 1373(a). Plainly, "[t]his is not the system Congress created." *Arizona*, 567 U.S. at 408.

Defendants' anti-commandeering argument also ignores the weight of authority against them that access to public property must be afforded on a non-discriminatory basis. Here, the Defendants deny access only to federal immigration officials. In that respect, EO12 is discriminatory on its face and therefore unconstitutional. The Third Circuit explained that "modern doctrine distinguishes between laws that merely impose an incidental economic burden on the federal government and those that subvert federal operations. The latter trigger immunity; the former do not." *CoreCivic*, 145 F.4th at 323. Banning federal immigration officials from entering

17

state property does not impose "an incidental economic burden" on the Federal Government—rather, the challenged EO12 is aimed at shutting down the possibility of cooperative custodial transfers. And, moreover, it flies in the face of other court decisions explaining that states "cross the line" when they target only federal officials. For example, in *United States v. King Cnty.*, 122 F.4th 740, 758 (9th Cir. 2024), the court required non-discriminatory access to public property consistent with the intergovernmental immunity doctrine. *Id.* at 758 ("[The court] would not perceive a threat of unconstitutional commandeering when ICE uses county highways to transport immigration detainees from one place to another just because the county owns its highways."); *see also United States v. California*, 173 F.4th 1060, 1067 (9th Cir. 2026) (holding that California attempted "to directly regulate the federal government in its performance of law enforcement operations" by seeking "to control their conduct in performing law enforcement operations").

Defendants claim that individual state officials can refuse "warrantless" entry to immigration officials on state property. Defs. Br. at 25. But federal detainers *are* accompanied by warrants and supported by probable cause. Moreover, Defendants' argument that because a low-level official may deny consent, a supervisor may direct that denial, and the Governor may mandate it statewide, misunderstands the constitutional problem with EO12. Defs. Br. at 25-26. Individual discretion to consent or not to a custodial transfer in each instance is not the same as a categorical gubernatorial prohibition targeting federal immigration enforcement. It is not difficult to imagine scenarios where a state official at a particular property could validly exercise discretion in a non-discriminatory way that burdens the federal government only incidentally. For example, if federal and other state officials are denied access temporarily to a detention facility because the facility is undergoing necessary repairs that make secure transfers impracticable, such exercise of discretion would not create the constitutional problems at issue here. If "repairs" were used as a pretext to deny only federal immigration officials access to the same facility, a constitutional

18

problem would arise. The Federal Government has exclusive authority over the presence of aliens in the United States, including "which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396. The anti-commandeering doctrine has no application here because Defendants are not being asked to enforce the INA—they simply cannot block the Federal Government from doing so. *See Printz*, 521 U.S. at 924-935.

### 2.   *The INA Preempts Executive Order No. 12*

"[T]he very essence of supremacy" empowers the Federal Government to "remove all obstacles to its action within its own sphere." *See McCulloch*, 17 U.S. (4 Wheat.) at 427. Accordingly, state law is in conflict with federal law—and thus preempted—where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372-373 (2000) (quotations omitted); *see, e.g.*, *Hines*, 312 U.S. at 67. A state may not take action that "either frustrates the purpose of the national legislation or impairs the efficiency of th[e] agencies of the federal government to discharge the duties for the performance of which they were created." *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896); *see also Crosby*, 530 U.S. at 373. Congress may also indicate preemptive intent through "a statute's express language or through its structure and purpose." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). "[T]he scope of a statute's pre-emptive effect is guided by the rule that '[t]he purpose of Congress is the ultimate touchstone' in every pre-emption case." *Id.* (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996)). Where "the question is whether a Federal act overrides a state law, the entire scheme of the statute must . . . be considered and that which needs must be implied is of no less force than that which is expressed." *Savage v. Jones*, 225 U.S. 501, 533 (1912).

In this case, the federal scheme at issue is Congress's "extensive and complex" framework governing aliens' entry, apprehension, detention, and removal. *Arizona*, 567 U.S. at 395. Congress

has "instruct[ed] when it is appropriate to arrest an alien during the removal process." *Id.* at 407. Further, Congress requires federal immigration agents to detain criminal illegal aliens upon their release from local custody. 8 U.S.C. §§ 1226(c), 1231(a).

And even where "some presumption against preemption is appropriate," a state law is preempted if "the state Act presents a sufficient obstacle to the full accomplishment of Congress's objectives under the federal Act." *Crosby*, 530 U.S. at 374 n.8; *Hillman v. Maretta*, 569 U.S. 483, 490, 499 (2013) (noting a "'presumption against preemption' of state laws governing domestic relations" but holding preempted state law that "interfere[d] with Congress' objective").

To ensure federal officers can execute that mandate efficiently, Congress has expressly authorized the use of administrative warrants to expedite the detention and removal process. 8 U.S.C. § 1226(a). These warrants are not a procedural workaround; they are the instrument Congress specifically designed for civil immigration enforcement. A state that refuses to recognize administrative warrants as sufficient for access to its property nullifies the enforcement mechanism Congress prescribed. And Section 1357 authorizes federal agents to make arrests without any warrant if there is reason to believe the alien is unlawfully present in the United States, and the alien "is likely to escape before a warrant can be obtained." *Id.* § 1357(a)(2). Thus, while a state cannot displace federal immigration policy with its own immigration policy, it also cannot sabotage the federal cooperative scheme. *See id.* at 408-410.

Moreover, given the cooperative scheme Congress established between states and the Federal Government, not permitting access at the moment of release is not a neutral act—it is tantamount to rejecting the federal scheme itself. Under 8 U.S.C. § 1231(a)(1)(B)(iii), the removal period for an alien begins the day he is released from state custody. A state that denies federal officers access to the alien at that moment does not merely delay removal; it prevents the Federal Government from acting within the window that Congress expressly prescribed.

20

Congress simultaneously provided that an alien cannot be removed until he has served his state sentence. 8 U.S.C. § 1231(a)(4)(A). Congress could have occupied the field of alien detention, but it permits states to prosecute and incarcerate aliens for state crimes, and the Federal Government takes custody when the process concludes. *Id.* States must hold up their end of the bargain and permit federal immigration officers to take aliens after state sentences conclude. Refusing access at the moment of release is not a passive choice not to assist, it is an affirmative rejection of the specific cooperative structure that Congress established. This is not merely a "brooding federal interest" in immigration enforcement generally; it is a concrete and specific cooperative system respecting the constitutional framework of "dual sovereigns," one with enumerated statutory provisions defining exactly when state custody ends and federal custody must begin. *See Kansas v. Garcia*, 589 U.S. 191, 202 (2020).

a. <u>**Executive Order No. 12 Poses An Obstacle To The Enforcement Of The INA**</u>

EO12 interferes with the scheme Congress established for detaining and removing criminal aliens. In particular, the EO12 bars the orderly transfer of criminal aliens to federal custody under the terms that Congress contemplated and goes further to deprive federal officials of information they need to obtain custody at the appropriate time. Compl. ¶¶ 12, 27, 54.

Defendants attempt to defeat this argument by breaking the INA into three categories: (1) law enforcement cooperation, (2) federal duties, and (3) criminal provisions about aliens. Defs. Br. at 28. But it is how these three categories work together that preempt EO12. Congress set up a cooperative system that mandates the Federal Government conduct certain activities, like detain and deport aliens with final orders of removal and criminal aliens. Separating these three types of statuses is simply insisting that the premises of the United States's argument cannot be considered in sequence, as is necessary to see the force of its logic.

Defendants also invoke adverse Third Circuit precedent on §§ 1373 and 1644. Defs. Br. at 28-30. But the United States is not bringing a challenge to information sharing. Rather, Plaintiff's grievance here is that EO12 prevents the United States from *accessing* aliens, not that is withholding information about aliens. Consequently, the holding in *Ocean County Bd. of Comm'rs v. AG of State of N.J.*, 8 F.4th 176, 181-82 (3d Cir. 2021) has no bearing on an executive order that operates by blocking physical access to aliens in custody at the moment Congress mandated their transfer to federal detention.

The Federal Government is required to detain criminal aliens upon their release from state custody. 8 U.S.C. §§ 1226(c), 1231(a). Congress built a cooperative framework to effectuate that mandate, one that contemplates state and local participation in the orderly transfer of criminal aliens into federal custody and authorizes administrative warrants to carry it out without delay. 8 U.S.C. § 1226(a); 8 C.F.R. § 287.7. Under that framework, once DHS has determined to issue a detainer to a criminal justice agency, "such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by [DHS]." 8 C.F.R. § 287.7(d). EO12 makes the orderly transfer of criminal aliens impossible and, therefore, it serves as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *See Hines*, 312 U.S. at 67; Compl. ¶¶ 12, 27.

   **b.  The Complaint Sufficiently Alleges That Executive Order No. 12 Interferes With Immigration Enforcement**

Defendants' own concessions undermine their adequacy-of-pleading argument at every turn. First, Defendants concede that they will permit federal immigration officers to access nonpublic areas of state property if the officers obtain a judicial warrant. Defs. Br. at 33. That concession defeats their commandeering argument entirely. If compelling access through a judicial warrant is constitutional, the objection is not to the access itself but, rather, is to the *form* of authorization. But rejecting administrative warrants as insufficient for access directly conflicts

with federal law. Congress expressly authorized administrative warrants to expedite the detention and removal process. 8 U.S.C. § 1226(a); 8 C.F.R. § 287.7. A state cannot condition compliance with a federal statutory scheme on the Federal Government obtaining a judicial warrant where the INA would require only an administrative warrant or no warrant at all. That is not a permissible exercise of state sovereignty and is a direct conflict with federal law.

Second, Defendants argue that most New Jersey courthouses are operated by counties and municipalities rather than the State and therefore fall outside EO12's reach. Defs. Br. at 34. But some courthouses are operated by New Jersey executive branch departments and agencies, and EO12 bars federal immigration officers from those. *See id.* That is enough to state a claim. The Complaint specifically alleges that ICE conducts civil immigration enforcement actions in or near courthouses and that EO12 substantially interferes with those operations. Compl. ¶¶ 54-56.

Third, Defendants suggest that the Complaint fails to explain why public areas of courthouses would be insufficient for immigration enforcement. Defs. Br. at 34-35. But the Complaint does explain it. The logic of conducting arrests in nonpublic areas of courthouses is to effectuate custodial arrests without disrupting ongoing court proceedings or endangering the public. Compl. ¶¶ 55-56. Federal immigration officers exercise discretion and common sense in deciding where enforcement actions should be undertaken to best ensure the safety of the community. 8 U.S.C. § 1229(e) (expressly contemplating that immigration enforcement actions may take place at state courthouses); Compl. ¶ 4. EO12 eliminates that discretion categorically.

Fourth, Defendants argue that the Immigrant Trust Directive's exception for aliens charged with violent or serious offenses means EO12 does not meaningfully obstruct ICE's ability to arrest dangerous criminals already in state custody. Defs. Br. at 34-35; *see* Compl. ¶ 58. That argument fails because the carve-out for violent or serious offenses does nothing to remove the obstacle for the full range of criminal aliens Congress requires the Federal Government to detain under 8 U.S.C.

23

§§ 1226(c) and 1231(a), including aliens whom New Jersey has elected not to classify as having committed violent or serious offenses, but who may in fact have done so, or who are otherwise subject to mandatory federal detention. New Jersey should not be permitted to create obstacles for the aliens it doesn't want ICE to apprehend, only to remove those obstacles on a whim for certain classes of criminals it deems worthy of handing over to ICE.

Fifth, Defendants assert throughout that the Complaint fails to adequately plead that EO12 actually impedes federal immigration enforcement. *See generally* Defs. Br. However, the Complaint specifically alleges that EO12 will substantially interfere with DHS's civil immigration enforcement operations at state correctional facilities and courthouses, Compl. ¶ 54; that it "thwart[s] ICE's ability to arrest dangerous criminals [] already in state custody through the use of immigration detainers[,]" Compl. ¶ 58; that it prevents federal immigration officers from using state property as a staging area, processing location, or operations base, Compl. ¶¶ 63-67; and that it results in "undue interference with the implementation of Executive Branch immigration policies" that causes harm to the federal Sovereign, Compl. ¶ 52. Those allegations are more than sufficient to survive a motion to dismiss.

### C. Executive Order No. 12 Violates Intergovernmental Immunity.

The doctrine of intergovernmental immunity "generally immunizes the Federal Government from state laws that directly regulate or discriminate against it." *Washington*, 596 U.S. at 835 (citing *South Carolina v. Baker*, 485 U.S. 505, 523 (1988)). The intergovernmental immunity doctrine establishes that "the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." *McCulloch*, 17 U.S. (4 Wheat.) at 436. The doctrine applies "in the absence of a specific [conflicting] federal law, [ensuring that] federal officers are immune from state interference with acts 'necessary and proper'

24

to the accomplishment of their federal duties." *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993), *aff'd*, 54 F.3d 825 (D.C. Cir. 1995) (citing *Neagle*, 135 U.S. at 10)).

A state law is invalid "if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *North Dakota*, 495 U.S. at 435; *Baker*, 485 U.S. at 523. "A state law regulates the United States directly when it 'places [either] a prohibition' or mandate on the Federal Government." *CoreCivic*, 145 F.4th at 321 (quoting *Hancock v. Train*, 426 U.S. 167, 180 (1976)). State laws violate intergovernmental immunity if they "impose a burden on the national government tantamount to an interference . . . with the . . . performance of its functions." *Id.* at 323 (citing *Graves v. People of State of N.Y. ex rel O'Keefe*, 306 U.S. 466, 481 (1939); *Hancock*, 426 U.S. at 179-80) (holding that a state could not forbid federal facilities from operating without a state pollution permit). In short, when states "substantially interfere[] with [the] federal [government's] operations," they "directly regulate[] the federal government[.]" *CoreCivic*, 145 F.4th at 322.

In addition to direct regulation of the United States, the Supremacy Clause also prohibits "states laws that . . . discriminate against the Federal Government or those with whom it deals." *Washington*, 596 U.S. at 838 (alteration and quotations omitted). "[A] state law discriminates against the Federal Government . . . if it singles [it] out for less favorable treatment or if it regulates [it] unfavorably on some basis related to [its] governmental status." *Id.* at 839.

**1.   *Executive Order No. 12 Impermissibly Regulates The Federal Government***

Under a straightforward application of these principles, EO12 "places a prohibition on the Federal Government," *Hancock*, 426 U.S. at 180, and improperly seeks to regulate its immigration enforcement functions. *See United States v. Town of Windsor*, 765 F.2d 16, 18 (2d Cir. 1985) ("Absent congressional consent, direct state regulation of the activities of the Government is barred by the Supremacy Clause."). And it is abundantly clear that the purpose and effect of EO12 is

25

precisely to engage in that form of impermissible regulation. Compl. ¶¶ 46-48. Indeed, EO12 defines "federal immigration officers" to include ICE and CBP, and then effectively bars those officers from access to or use of state property for the purpose of facilitating federal enforcement of civil immigration law. EO12, §§ 1-3. Every other law enforcement agency retains unrestricted access to the same property. Compl. ¶¶ 10, 13. And it is likewise clear that the purpose and effect of EO12 is precisely to engage in that form of impermissible regulation. Compl. ¶¶ 46-48.

Further, the anti-commandeering doctrine is inapplicable here as it protects states from being conscripted to administer federal programs. *Printz*, 521 U.S. at 933. Here, the United States is not seeking to force Defendants to implement a federal scheme as in *Printz*. The United States simply wants to implement its own federal scheme and not have the Defendants interfere.

The Tenth Amendment also does not empower a state to issue an executive order singling out two named federal agencies and barring them from carrying out their congressionally mandated functions on state property. Moreover, when a state defines the regulated class by reference to specific federal agencies and their governmental functions, as EO12 does expressly, it is not merely acting as a proprietor managing its facilities. It is primarily acting as a regulator targeting the Federal Government, which is precisely what intergovernmental immunity prohibits. *See Washington*, 596 U.S. at 835. A state cannot launder a regulatory attack on the Federal Government through the language of property management when such language really just "seeks to sidestep the usual two-prong test that courts use to enforce the 'bedrock principle' that states may not regulate their federal counterpart." *CoreCivic*, 145 F.4th at 319. Indeed, the Supremacy Clause looks to what a law does, not what it calls itself. *See McCulloch*, 17 U.S. (4 Wheat.) at 431.

In *CoreCivic*, similar to here, New Jersey passed a law that on its face did not apply directly to the Federal Government but rather applied to the state as well as municipalities and private contractors. *CoreCivic*, 145 F.4th at 321-22. Yet the Third Circuit held that it violated

26

intergovernmental immunity because it was *functionally* a direct regulation of the Federal Government. *Id.* at 321-35 (New Jersey law "directly regulated the federal government even though 'the text [of the challenged law] did not apply to the federal government.'"). The court explained that intergovernmental immunity "is not a formalist doctrine[;]" courts must "look through form and behind labels to substance" and probe the "purpose or self-evident operation" of a state law to see whether it achieves indirectly what it could not do directly. *Id.* at 322 (cleaned up). Notably, the court found that the state law carried "the same sting as a law whose text applies expressly to the federal government" because it functionally eliminated the United States's chosen method of detaining immigration detainees in New Jersey. *Id.* at 325.

Similarly, EO12 regulates the United States because of its function. *See id.* at 322. Congress expressly authorized administrative warrants to expedite the detention and removal process. 8 U.S.C. § 1226(a); 8 C.F.R. § 287.7. By requiring a judicial warrant to permit federal access to state property, EO12 forecloses federal immigration officials' use of congressionally authorized administrative warrants and imposes a different method, with a different standard, on the United States for effectuating detentions. States have no power to prevent federal agents from carrying out their duties "until they satisfy a state officer." *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956). But the judicial warrant requirement is just that—a state's condition that federal officers must satisfy before they may execute their federal mandate. That is a regulation of the United States's "core power to enforce immigration laws[,]" regardless of whether EO12's text is addressed to state officials or federal ones. *CoreCivic*, 145 F.4th at 319; *see also GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 757 (9th Cir. 2022) (en banc) (state law would impermissibly "give California the power to control ICE's immigration detention operations in the state").

Defendants rely on *McHenry Cnty. v. Kwame Raoul*, 44 F.4th 581 (7th Cir. 2022), Defs. Br. at 40-42, but that case is distinguishable. *McHenry Cnty.* involved lease of property to the

27

Federal Government; here the United States does not compel Defendants to lease property to anyone, but seeks temporary access to effectuate custodial transfers of aliens as contemplated in the cooperative scheme in the INA. And insofar as the court in *McHenry Cnty.* did not apply "the functional approach that intergovernmental immunity demands," *CoreCivic's* use of that approach makes it the more compelling (and controlling), case. *CoreCivic*, 145F.4th at 325.

### 2. *Executive Order No. 12 Impermissibly Discriminates Against The Federal Government*

EO12 "explicitly treats" federal immigration agents "differently from" other law enforcement personnel. *King Cnty.*, 122 F.4th at 757. EO12 unlawfully discriminates against the United States by singling out ICE and CBP for unfavorable treatment. *See McHenry Cnty.*, 44 F.4th at 593. Defendants claim that the United States failed to put forth a comparator because no state agency performs civil immigration enforcement. *See* Defs. Br. at 43-45. That argument fails on three independent grounds.

First, it misses the point. EO12 is facially discriminatory because it targets only federal immigration officers—ICE and CBP—denying them certain access and use of state property, and therefore to detainees, absent a judicial warrant. *See id.*; Compl. ¶¶ 5-10, 57. The discriminatory nature of EO12 is apparent on its face; it does not regulate law enforcement generally, it regulates ICE and CBP specifically. There is, therefore, no need to look for comparators; by their terms, EO12 imposes a burden unique to the United States based on the "status" of federal immigration officials as federal immigration officials. *North Dakota*, 495 U.S. at 438.

Second, the argument proves too much. If the absence of an identical state comparator were sufficient to foreclose any discrimination claim against the United States, then states could discriminate against ICE and CBP without limit simply because no state agency performs the same function. That cannot be the law. The Supreme Court's decision in *Washington* does not hold that discrimination requires a perfect functional equivalent; it requires only that the state *not* treat the

Federal Government unfavorably on some basis related to its governmental status. *Washington*, 596 U.S. at 839. However, EO12 does exactly that.

Third, though none are needed, there *are* comparators. By the terms of EO12, other law enforcement, federal and state, retain unrestricted access to the state property that is foreclosed to ICE and CBP. Compl. ¶¶ 10, 13. By EO12's terms, Federal, state, and local law enforcement all operate on state property without restriction. EO12, §§ 1-3. The only difference between, as far as EO12 is concerned, between ICE and CBP and other law enforcement that receives more favorable treatment is their enforcement of federal immigration law. That is discrimination on the basis of government function, which is prohibited. *See North Dakota*, 495 U.S. at 438.

The Ninth Circuit's decision in *King Cty.* is instructive. There, King County argued that its executive order was non-discriminatory because it regulated "disruptive" conduct generally. The Ninth Circuit rejected that argument because the order applied to ICE operations, not to all disruptive conduct. *King Cty.*, 122 F.4th at 757-58 ("Requiring this form of non-discriminatory access to [public] property consistent with the intergovernmental immunity doctrine does not create a back-end anti-commandeering problem. [The court] would not perceive a threat of unconstitutional commandeering when ICE uses county highways to transport immigration detainees from one place to another just because the county owns its highways."). The same is true here. The facial targeting of federal immigration officers (*i.e.*, ICE and CBP) is discrimination.

Finally, Defendants' burden argument also fails. Defs. Br. at 45. EO12 does not merely "decline[] to ease the burden of civil immigration enforcement[,]" *id.*, it affirmatively *changes* how the United States must conduct its operations. EO12 forecloses the use of congressionally authorized administrative warrants, requires federal officers to seek judicial authorization that no other law enforcement agency must obtain, and eliminates access to property that ICE and CBP

29

were previously using for staging, processing, and detention operations. Compl. ¶¶ 5-7, 54, 58, 63-67. Those are concrete operational burdens imposed on the federal government and no one else.

## V. CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss.


DATED: June 1, 2026                              Respectfully Submitted,


TODD M. BLANCHE                          */s/ Robert O. Lindefjeld*
Acting Attorney General                   Assistant Director
                                          U.S. Department of Justice, Civil Division
BRETT A. SHUMATE                          Enforcement & Affirmative Litigation
Assistant Attorney General                Branch
Civil Division                            P.O. Box 386
                                          Washington, DC 20044-0386
YAAKOV M. ROTH                            Telephone: (202) 451-7488
Principal Deputy Assistant Attorney General   Email: robert.o.lindefjeld@usdoj.gov
Civil Division

SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General

POOJA D. MAJMUNDAR
Trial Attorney
U.S. Department of Justice, Civil Division
Enforcement & Affirmative Litigation Branch   *Attorneys for the United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

/s/ Robert O. Lindefjeld
Assistant Director
U.S. Department of Justice, Civil Division
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044-0386
Telephone: (202) 451-7488
Email: robert.o.lindefjeld@usdoj.gov

31