**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF NEW JERSEY and MIKIE SHERRILL, *in her official capacity as Governor of the State of New Jersey*,<br><br>Defendants. | Civil Action No. 26-1770 (GC) (JTQ)<br><br>**OPINION** |

**CASTNER, District Judge**

**THIS MATTER** comes before the Court upon Defendants the State of New Jersey and Governor Mikie Sherrill's Motion to Dismiss Plaintiff United States of America's Complaint (ECF No. 1) under Federal Rules of Civil Procedure (Rules) 12(b)(1) and 12(b)(6). (ECF No. 10.) The United States opposed, and Defendants replied. (ECF Nos. 14, 20.) The American Civil Liberties Union of New Jersey and 19 other organizations (ACLU-NJ) filed a brief as *amicus curiae* in support of Defendants' Motion, and the Federation for American Immigration Reform (FAIR) filed a brief as *amicus curiae* in opposition to Defendants' Motion. (ECF Nos. 12, 18.) The Court has carefully reviewed the parties' submissions and decides the matter without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Defendants' Motion is **GRANTED**.

## I. BACKGROUND

The issue in this case is whether New Jersey Executive Order 12 (EO12) violates the Supremacy Clause of the United States Constitution.[1] Governor Sherrill issued EO12 on February 11, 2026. (ECF No. 1-4 at 7.)[2] Under the Order, New Jersey "[e]xecutive [b]ranch departments and agencies shall not permit or consent to federal immigration officers entering, accessing, or using nonpublic areas of State property for the purpose of facilitating federal enforcement of civil immigration law." (*Id.* ¶ 2.)[3] The Order also prohibits New Jersey executive branch departments and agencies from allowing "federal immigration officers [to use] State property as a staging area, processing location, or operations base for the purpose of facilitating federal enforcement of civil immigration law." (*Id.* ¶ 3.) However, neither of these prohibitions apply if the federal immigration officers receive a judicial warrant. (*Id.* ¶¶ 2-3.)[4] The Executive Order also makes

---

1 On a motion to dismiss under Rule 12(b)(6), the Court must accept all facts as true, but courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation modified).

2 Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

3 EO12 defines "[e]xecutive [b]ranch departments and agencies" as "any of the principal departments in the [e]xecutive [b]ranch of New Jersey State government and any agency, authority, board, bureau, commission, division, office, or other instrumentality within or created by any such department, and any independent State authority, commission, instrumentality, or agency over which the Governor exercises executive authority, as determined by the Attorney General." (ECF No. 1-4 ¶ 1.b.) It defines "[f]ederal immigration officers" as "agent[s] of federal Immigration and Customs Enforcement, federal Customs and Border Protection, any similar agency or successor agency, or any other federal law enforcement agency tasked with civil immigration enforcement or working in concert with Immigration and Customs Enforcement or Customs and Border Protection." (*Id.* ¶ 1.c.) And it defines "State property" as "facilities, premises, and parcels, or portions thereof, that are owned, operated, leased, or controlled by New Jersey [e]xecutive [b]ranch departments and agencies, including but not limited to office buildings, parking lots, and parking garages." (*Id.* ¶ 1.a.)

4 EO12 defines a "[j]udicial warrant" as a "warrant based on probable cause and issued by a federal Article III judge, a federal magistrate judge, or a Superior Court judge of the State of New

clear that "[n]othing in this Order shall be construed to restrict, prohibit, or in any way prevent an [e]xecutive [b]ranch [d]epartment or agency from . . . allowing federal authorities access to any State property that is open to the general public, on the same terms on which the general public can access such property." (*Id.* ¶ 5.e.)

On February 23, 2026, the United States filed this case challenging the constitutionality of EO12. (ECF No. 1.) As alleged in the Complaint, the United States has not yet been the subject of an enforcement action for alleged violations of EO12. (*See id.* ¶ 66.) Nonetheless, the United States alleges that, as a result of EO12, its officers will not be able to arrest individuals in nonpublic areas of state courthouses, which will result in immigration operations that are less safe. (ECF No. 1 ¶¶ 49, 55-57, 60, 62.) Specifically, citing to Immigration and Customs Enforcement (ICE) instructions, the United States asserts that individuals in courthouses "are typically screened by law enforcement personnel . . . for weapons and other contraband," so the risk of a dangerous encounter is lower than encounters in public which are unpredictable. (ECF No. 1 ¶¶ 4, 49, 55-57, 60, 62; ECF No. 1-3 at 2.) The United States also alleges that it uses state-owned property for custodial transfers and processing. (ECF No. 1 ¶¶ 64-65.)

The United States contends EO12 is unlawful on three grounds, each of which is based on the Supremacy Clause. First, the United States asserts federal immigration law preempts EO12 (Count One). (*Id.* ¶¶ 68-74.) Second, the United States alleges the Order unlawfully discriminates against the federal government (Count Two). (*Id.* ¶¶ 75-79.) Third, the United States contends that EO12 unlawfully regulates the federal government (Count Three). (*Id.* ¶¶ 80-83.) The United States seeks a judgment that EO12 violates the Supremacy Clause and is therefore invalid, and it

---

Jersey, that authorizes government authorities to search a location or apprehend a person who is the subject of the warrant." (ECF No. 1-4 ¶ 1.e.)

requests that the Court issue a permanent injunction prohibiting Defendants and their successors, agents, and employees from enforcing or implementing EO12. (*Id.* at 20.) Defendants filed the instant Motion to Dismiss in response, (ECF No. 10), which is now ripe for review.

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

Rule 12(b)(1) permits a defendant to move at any time to dismiss the complaint for lack of subject matter jurisdiction on either facial or factual grounds. *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). A facial challenge asserts that "the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction." *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 438 (D.N.J. 1999). In analyzing a facial challenge, a court "must only consider the allegations of the complaint and documents attached thereto, in the light most favorable to the plaintiff." *Gould Elecs. Inc.*, 220 F.3d at 176. "A court considering a facial challenge construes the allegations in the complaint as true and determines whether subject matter jurisdiction exists." *Arosa Solar Energy Sys., Inc. v. Recom Solar, LLC*, Civ. No. 18-1340, 2021 WL 1196405, at *2 (D.N.J. Mar. 30, 2021).

A factual challenge, on the other hand, "attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts." *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016). The "trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). "Therefore, a 12(b)(1) factual challenge strips the plaintiff of the protections and factual deference provided under 12(b)(6) review." *Hartig Drug Co.*, 836 F.3d at 268. Regardless of the type of challenge, the plaintiff bears the "burden of proving that the court has subject matter jurisdiction." *Cottrell v. Heritages Dairy Stores, Inc.*, Civ. No. 09-1743, 2010

WL 3908567, at *2 (D.N.J. Sep. 30, 2010) (citing *Mortensen*, 549 F.2d at 891).

### B. Rule 12(b)(6)

On a motion to dismiss for failure to state a claim upon which relief can be granted, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'" *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Dirs. of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)). When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021)). The defendant bringing a Rule 12(b)(6) motion bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)).

## III. DISCUSSION

### A. Standing

The parties dispute whether the United States adequately alleges Article III standing. (ECF No. 10-1 at 17-21; ECF No. 14 at 16-22.) To have standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The Court addresses each of the three standing requirements in turn.

### 1. ***Injury In Fact***

"To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (citation modified). The United States argues it has pled two distinct injuries in fact. First, the United States asserts that it has suffered a "sovereign harm" because EO12 violates federal law and the Supremacy Clause. (ECF No. 14 at 17.) Second, the United States contends it has suffered a "traditional concrete injury" because "federal immigration officers are compelled to carry out their congressionally mandated duties in a more dangerous manner." (*Id.*)

The Court need not address the sovereign harm theory of injury because the United States has adequately pled a traditional harm. The United States alleges that, as a result of EO12, it can no longer conduct immigration enforcement efforts in nonpublic areas of state property such as courthouses, as ICE officers were previously instructed to do. (ECF No. 1 ¶¶ 4, 49, 55-57, 60, 62; *see also* ECF No. 1-3.) As a result, the United States alleges its officers' ability to safely conduct immigration operations is hampered because its officers run a greater risk of encountering individuals with weapons or other contraband. (ECF No. 1 ¶¶ 49, 56; ECF No. 1-3 at 2.) The Court finds the United States' allegations are enough at the Motion to Dismiss stage because "'actual or threatened interference with the performance of . . . proper governmental functions' qualifies as a concrete harm." *United States v. Illinois*, 796 F. Supp. 3d 494, 508 (N.D. Ill. 2025)[5]

---

[5] When analyzing standing, the Court "assume[s] that the party asserting federal jurisdiction is correct on the legal merits of his claim[.]" *Hassan v. City of New York*, 804 F.3d 277, 289 (3d Cir. 2015) (citation modified). Accordingly, the Court must assume that the United States' asserted functions are proper for the purpose of analyzing injury in fact.

(alteration in original) (quoting *United States v. Ekblad*, 732 F.2d 562, 563 (7th Cir. 1984)).[6]

### ***2. Traceability and Redressability***

"The second and third standing requirements—causation and redressability—are often flip sides of the same coin." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (citation modified). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id.* at 381.

To satisfy the second requirement, the United States must allege that the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation modified). In other words, there must be "a causal connection between the injury and the conduct complained of[.]" *Id.* (citation modified). And under the third requirement, "[t]o determine whether an injury is redressable," courts "consider the relationship between the judicial relief requested and the injury suffered." *Murthy v. Missouri*, 603 U.S. 43, 73 (2024) (citation modified). Redress needs to be "likely," though it need not be complete. *Lujan*, 504 U.S. at 560-61; *see also Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) ("[T]he ability to effectuate a partial remedy satisfies the redressability requirement." (citation modified)); *Pub. Int. Res. Grp. of N.J., Inc. v.*

---

[6] Although neither party has indicated whether EO12 has required enforcement, the Court does not find the threat of future injury "unduly speculative." *United States v. Illinois*, 796 F. Supp. 3d 494, 508 (N.D. Ill. 2025) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013)). Governor Sherrill expressed her commitment to enforcing the Executive Order and even created an online portal so that New Jersey residents can upload their interactions with immigration officials to assist New Jersey in holding violators accountable. (ECF No. 1 ¶¶ 46-47.) This is enough. *See United States v. King County*, 122 F.4th 740, 750-51 (9th Cir. 2024) (holding United States had standing to challenge King County executive order when the County "has been clear that . . . [it] would enforce the [e]xectvie [o]rder" (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014))).

*Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 73 (3d Cir. 1990) (holding remedy that would "redress th[e] injury at least in part" sufficient for Article III standing), *cert. denied*, 498 U.S. 1109 (1991).

Defendants argue that the traceability requirement is not satisfied because, regardless of whether EO12 is in effect, "state officials could always, in their discretion, refuse entry to immigration officers who lack a judicial warrant or order requiring entry." (ECF No. 10-1 at 20.) Similarly, Defendants contend the United States has failed to allege redressability because "the [f]ederal [g]overnment has not sufficiently pled that it would gain access to nonpublic areas of . . . state properties in the future even if this Court issued an order enjoining application of EO12." (*Id.*) According to Defendants, this is because, even without EO12, New Jersey executive officials "would be aware of [the Governor's] policy concerns" so it would be "difficult to imagine rogue [New Jersey] executive branch officers permitting such prospective access[.]" (*Id.* at 20-21.)

The United States responds that, as for traceability, it is "not required to plead a counterfactual where EO12 does not exist" and must instead only allege that "the challenged conduct be a cause of the alleged injury." (ECF No. 14 at 20.) And as for redressability, the United States asserts that because executive branch officials can exercise their discretion in either direction absent EO12, the elimination of EO12 would partially redress the United States' injury, which is sufficient for standing. (*Id.* at 21-22.)

The Court agrees that both the traceability and redressability requirements are met. First, if an immigration officer is denied the ability to pursue immigration enforcement on New Jersey-owned property, that denial is "fairly" traceable to EO12. *Lujan*, 504 U.S. at 560; *see also Illinois*, 796 F. Supp. 3d at 510 ("The injuries alleged are also traceable to the [challenged policies]—without them, state and local law enforcement would be free to cooperate with federal immigration authorities.").

Second, the Court finds New Jersey's redressability argument—that, without EO12, state officers would still be unlikely to cooperate with immigration officers—unpersuasive. Courts have only found a lack of redressability in similar contexts when the injury would still exist regardless of the outcome of the lawsuit because the challenged conduct was also prohibited by a different state policy not before the court. *See United States v. City of Newark*, Civ. No. 25-5081, 2026 WL 1816022, at *2 (D.N.J. June 24, 2026) ("[F]or any alleged injuries that flow from restrictions common to both [New Jersey's Immigrant Trust Directive] and the [c]hallenged [p]olicies as applied to actors bound by both policies, the [f]ederal [g]overnment lacks standing to sue because its injuries would persist even if the [c]ourt enjoined the [c]hallenged [p]olicies.");[7] *United States v. City of Boston*, Civ. No. 25-12456, 2026 WL 1493706, at *8 (D. Mass. May 28, 2026) ("An order enjoining the Boston Trust Act would not liberate [Boston] to empower its officers to take actions state law does not authorize, nor give Boston police officers the individual choice to honor ICE detainers.").

By contrast, when individual officers are left with discretion to decide whether to do what was previously required of them under an enjoined state policy, courts have reasoned that redressability would be satisfied because those officers could exercise their discretion in a manner contrary to the enjoined policy thereby mitigating any injury posed by the policy. *See Illinois*, 796 F. Supp. 3d at 510 n.8 ("Although enjoining the [challenged policies] would not guarantee state and local cooperation with federal immigration authorities, providing state and local officials the option would at least partially redress the United States's alleged injuries." (citing *Uzuegbunam*, 592 U.S. at 291)); *Boston*, 2026 WL 1493706, at *8 (finding redressability unsatisfied by

[7] New Jersey's Immigrant Trust Directive is a statewide directive that limits voluntary cooperation with federal civil immigration enforcement. *United States v. City of Newark*, Civ. No. 25-5081, 2026 WL 1816022, at *2 (D.N.J. June 24, 2026).

contrasting with *Illinois* and finding that the remedy would not lessen or alleviate the United States' injury).

Here, the United States does not allege—nor do Defendants argue—that the provisions prohibiting state employees from allowing immigration officials onto state property to effectuate immigration enforcement are redundant of other state requirements. (*See generally* ECF Nos. 1, 10-1, 14, 20.)[8] Because enjoinment of EO12 would "effectuate a partial remedy" to the United States' asserted injury given the discretion afforded to state officers, the Court holds that redressability is satisfied. *See Uzuegbunam*, 592 U.S. at 291 (citation modified). And because the United States has therefore satisfied each of the three standing requirements, the Court finds the United States has Article III standing to pursue its Supremacy Clause claims. The Court turns to the merits of those claims next.

### B. Supremacy Clause and the Anticommandeering Doctrine

"Our Constitution created a legal system 'establishing two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it.'" *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 320 (3d Cir. 2025) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J., concurring)). Sometimes, state and federal authorities overlap. *Id.* at 319. "In such cases, some state rules may legitimately burden the federal government." *Id.* In other cases, "a state goes further, interfering directly with federal policy or 'destroy[ing]' it through 'hostile legislation.'" *Id.* (alteration in original) (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 400-01, 430

[8] Indeed, to the extent the Immigrant Trust Directive prohibits similar conduct to EO12, the former only applies to "local, county, and state law enforcement agencies," *County of Ocean v. Grewal*, 475 F. Supp. 3d 355, 361 (D.N.J. 2020), whereas the latter applies to all New Jersey "[e]xecutive [b]ranch departments and agencies," (ECF No. 1-4 ¶¶ 1.b, 2-3).

(1819)). When a state "crosses that line," it violates the Supremacy Clause, *id.*, which provides that federal law "shall be the supreme Law of the Land," U.S. Const. art. VI, cl. 2.

Two doctrines have emerged from the text of the Supremacy Clause that dictate when a state crosses this line: preemption and intergovernmental immunity. *CoreCivic*, 145 F.4th at 320. The United States contends that EO12 violates the Supremacy Clause under both doctrines. First, the United States argues that EO12 is preempted by the Immigration and Nationality Act of 1952 (INA), Pub. L. 82-414, ch. 477, 66 Stat. 163 (1952) (codified at 8 U.S.C. § 1101 *et seq.*) and related provisions (Count I). (ECF No. 1 ¶¶ 68-74; ECF No. 14 at 23-32.) Second, the United States argues that EO12 violates intergovernmental immunity because it regulates (Count Two) and discriminates against (Count Three) the federal government. (ECF No. 1 ¶¶ 75-83; ECF No. 14 at 32-38.) Defendants seek dismissal of each Count. (ECF No. 10-1 at 21-46.)

In seeking dismissal, Defendants rely on a doctrine that serves as a backstop to the Supremacy Clause: anticommandeering. *See Printz v. United States*, 521 U.S. 898, 924-25 (1997) ("The Supremacy Clause . . . makes 'Law of the Land' only 'Laws of the United States which shall be made in Pursuance [of the Constitution],' so the Supremacy Clause merely brings us . . . to the question [of] whether laws conscripting state officers violate state sovereignty and are thus not in accord with the Constitution." (citations omitted) (second alteration in original)). Under the anticommandeering doctrine, which is rooted in the Tenth Amendment, Congress may not "issue direct orders to the governments of the States." *Murphy v. N.C.A.A*, 584 U.S. 453, 471 (2018). "Where a federal interest is sufficiently strong to cause Congress to legislate, it must do so directly; it may not conscript state governments as its agents." *New York v. United States*, 505 U.S. 144, 178 (1992); *see also Printz*, 521 U.S. at 912 ("[S]tate legislatures are *not* subject to federal direction." (emphasis in original)). "This rule applies . . . not only to state officers with

policymaking responsibility but also to those assigned more mundane tasks," *Murphy*, 584 U.S. at 473, and it applies "[n]o matter how powerful the federal interest involved," *New York*, 505 U.S. at 178.

The anticommandeering doctrine serves three important purposes. First, "a healthy balance of power between the States and the [f]ederal [g]overnment reduces the risk of tyranny and abuse from either front." *Murphy*, 584 U.S. at 473 (citation modified). Second, the doctrine promotes political accountability because, "if a State imposes regulations only because it has been commanded to do so by Congress, responsibility is blurred" and "[v]oters who like or dislike the effects of the regulation" do not know "who to credit or blame." *Id.* at 473-74. Third, "the anticommandeering principle prevents Congress from shifting the costs of regulation to the States." *Id.* at 474.

With these principles in mind, the Court turns to the United States' Supremacy Clause claims.

### ***1. Preemption***

Tracing their roots to the Supremacy Clause, "three types of preemption have emerged through caselaw—express, conflict, and field—but 'all of them work in the same way.'" *Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of N.J.*, 8 F. 4th 176, 181 (3d Cir. 2021) (quoting *Murphy*, 584 U.S. at 477). "For a federal law to preempt state law—regardless of the type of preemption claimed—it must satisfy two [initial] requirements." *Id.* First, "the federal law must represent the exercise of a power conferred on Congress by the Constitution." *Id.* (citation modified). "Second, because the Constitution confers upon Congress the power to regulate individuals, not States, the federal law must be best read as one that regulates private actors." *Id.* (citation modified).

In addition to these threshold requirements, the Supreme Court and the Third Circuit have provided instruction on how lower courts are to evaluate each type of preemption. "Express

preemption applies where Congress, through a statute's express language, declares its intent to displace state law." *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010) (citing *Hillsborough County v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 713 (1985)). "Field preemption applies where 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* (quoting *Hillsborough*, 471 U.S. at 713). "Conflict preemption nullifies state law inasmuch as it conflicts with federal law, either where compliance with both laws is impossible or where state law erects an 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Hillsborough*, 471 U.S. at 713). Regardless of the type of preemption, the intent of Congress is the "ultimate touchstone" and courts "start with the basic assumption that Congress did not intend to displace state law." *Id.* at 115-16 (citation modified).

The United States alleges that EO12 is invalid due to conflict preemption. (ECF No. 1 ¶ 72; *see also* ECF No. 14 at 23 (arguing that EO12 "is preempted[] because it stands as an obstacle 'to the accomplishment and execution of the full purposes and objectives of Congress'").) The United States asserts that complying with both federal law and EO12 is impossible and that EO12 obstructs the United States from carrying out the INA and other related statutes. (*See* ECF No. 14 at 30). The inquiry into obstruction of congressional purpose is "a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). "Invoking some brooding federal interest . . . should never be enough to win preemption of state law." *Va. Uranium, Inc v. Warren*, 587 U.S. 761, 767 (2019) (Gorsuch, J., plurality opinion). Instead, "courts should assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." *Arizona v. United States*, 567 U.S. 387, 400 (2012) (citation

modified). Thus, "a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (citation modified). A "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives" is inappropriate because "such an endeavor would undercut the principle that it is Congress rather than the courts that pre-empts state law." *Id.* (citation modified).

Defendants divide the statutory and regulatory provisions cited by the United States, most of which are contained in the INA, into three categories and argue that EO12 does not conflict with any of the provisions. (ECF No. 10-1 at 28-32.) The United States responds that it is "how these three categories work together that preempt[s] EO12." (ECF No. 14 at 29.) In particular, when the provisions are considered in tandem, the United States argues that EO12 conflicts with the federal government's ability to "detain and deport aliens with final orders of removal and criminal aliens" and "access[] aliens." (*Id.* at 29-30 (emphasis omitted).) The Court will analyze the three categories of provisions—along with others that the United States failed to cite in its Complaint—and consider whether EO12 "undermines the intended purpose and 'natural effect' of [those] provisions," *Crosby*, 530 U.S. at 373, in isolation or in tandem.

*a. Provisions Regarding Cooperation in Federal Immigration Enforcement*

In the Complaint, the United States cites several cooperation-related provisions for the proposition that EO12 is preempted: 8 U.S.C. §§ 1357(g)(10), 1373(a)-(b), 1644. (ECF No. 1 ¶¶ 28-29, 68, 72.) As for §§ 1373 and 1644, the Third Circuit has expressly held that because "neither § 1373 nor § 1644 regulates private actors," those provisions "cannot serve as a basis for preemption." *Ocean Cnty.*, 8 F.4th at 178-79, 182.[9] The United States argues that *Ocean County*

[9] Section 1373 outlines that a "State . . . entity or official may not prohibit, or in any way restrict, any government entity or official" from sharing immigration information with federal authorities. 8 U.S.C. § 1373. Section 1644 provides that "no State or local government entity may

has no bearing on the instant matter because "the United States is not bringing a challenge to information sharing" but is instead arguing "EO12 prevents the United States from *accessing* aliens." (ECF No. 14 at 30 (emphasis in original).)[10] The Court finds this response unconvincing. If the United States' grievances with EO12 do not concern information sharing, then 8 U.S.C. § 1373 and § 1644—which both apply only to information sharing—cannot provide a basis for preemption, independent of the Third Circuit's ruling in *Ocean County*.

As to § 1357(g)(10), the Court also finds no conflict preemption. That provision states that there is no "require[ment for] an agreement . . . in order for any officer or employee of a State or political subdivision of a State . . . to communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States" or "to cooperate with the Attorney General in the

---

be prohibited, or in any way restricted," from communicating immigration information to the federal government. 8 U.S.C. § 1644.

[10] *Ocean County* concerned the constitutionality of New Jersey's Immigrant Trust Directive. Among other features, the Immigrant Trust Directive prohibits state, county, and local law enforcement "from inquiring about the immigration status of any individual" and "[p]roviding any non-public personally identifying information regarding any individual." *Grewal*, 475 F. Supp. 3d at 364 (citation modified). The Cape May County Sheriff and the County of Cape make sought a declaration that the Immigration Trust Directive was preempted by 8 U.S.C. §§ 1373 and 1644. *Id.* at 361. The defendants brought a motion to dismiss and the district court granted the motion because (1) 8 U.S.C. §§ 1373 and 1644 "plainly regulate the sharing of such information by state and local government officials, [but] significantly, they do not regulate private actors in any way," (2) the federal statutory provisions do not "require[] States and local governments to share personal identifying information and dates of release from detention," and (3) if the federal statutory provisions "were broadly construed to cover all types of information possibly related to the enforcement of immigration law, including personal identifying data and dates of release of inmates, they would violate the Tenth Amendment under the anticommandeering doctrine." *Id.* at 373, 376, 378. The Third Circuit affirmed, thereby upholding the Immigrant Trust Directive, on the first ground: "Our conclusion that neither § 1373 nor § 1644 regulates private actors is fatal to [a]ppellants' argument that they preempt the Directive. A federal statute that does not regulate private actors cannot serve as a basis for preemption, so [a]ppellants' claims must fail." *Ocean Cnty. Bd. of Comm'nrs v. Att'y Gen. of N.J.*, 8 F.4th 176, 182 (3d Cir. 2021) (citation omitted). The Third Circuit did not address the other grounds for dismissal. *See id.* at 182 & n.4.

identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10). But, like in *Ocean County*, this provision does not regulate private actors; instead, it clarifies that states are free to cooperate with the federal government without an agreement. *See City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("Section 1357 does not require cooperation at all."). Indeed, the United States does not rely on § 1357(g)(10) in the preemption section of its brief, (ECF No. 14 at 22-32), and the Court finds it cannot serve as a basis for preemption, *see United States v. New York*, 810 F. Supp. 3d 329, 350 (N.D.N.Y. 2025) ("[S]tate and local policies, which withhold state cooperation for federal immigration enforcement activities, are not preempted by [§ 1357(g)]." (collecting cases)).

*b. Provisions Regarding Immigration Officials' Authorities and Obligations*

The United States next cites several provisions outlining immigration officials' authorities under the INA for the proposition that EO12 is preempted: 8 U.S.C. §§ 1226(c), 1231(a), and 8 C.F.R. § 287.7. (ECF No. 1 ¶¶ 12, 26-27, 58, 68, 72; ECF No. 14 at 27-32.) In its briefing, the United States argues that the "[f]ederal [g]overnment is required to detain criminal aliens upon their release from state custody." (ECF No. 14 at 30 (citing 8 U.S.C. §§ 1226(c), 1231(a)).) And, according to the United States, Congress "built a cooperative framework to effectuate that mandate," which "contemplates state and local participation in the orderly transfer of criminal aliens into federal custody and authorizes administrative warrants to carry [the mandate] out without delay." (*Id.* (citing 8 C.F.R. § 287.7).) The United States argues that EO12 serves as an obstacle to the accomplishment of the full purposes and objectives of Congress because it "makes the orderly transfer of criminal aliens impossible." (*Id.*)

The Court turns to the cited provisions. Under § 1226(c), the federal government "shall take into custody any alien who" is inadmissible or deportable or who is charged with, is arrested

for, is convicted of, or admits to having committed, certain crimes. 8 U.S.C. § 1226(c)(1). The provision also states that the federal government "shall issue a detainer for an alien" who is inadmissible under certain provisions or who has a criminal history, and "if the alien is not otherwise detained by Federal, State, or local officials," the Secretary of Homeland Security "shall effectively and expeditiously take custody of the alien." *Id.* § 1226(c)(3). Under § 1231(a), if a non-citizen is removable but has been detained—*i.e.*, while serving a prison sentence—"the Attorney General shall remove the alien from the United States within a period of 90 days" following the "releas[e] from detention or confinement." *Id.* § 1231(a)(1).

The regulations elaborate on the detainer provisions. Under those regulations, a detainer "serves to advise another law enforcement agency that the Department [of Homeland Security] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a). The "detainer is a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." *Id.* If the Department of Homeland Security issues a detainer "for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours . . . in order to permit assumption of custody by the Department." *Id.* § 287.7(d).

The Court finds these provisions do not serve as a basis for conflict preemption. The federal government has an obligation to remove certain non-citizens within 90 days of their release from custody, 8 U.S.C. § 1231(a)(1), but nothing in the INA indicates that states are required to assist the federal government in meeting this obligation. The United States maintains that Congress "contemplat[ed] state and local participation in the orderly transfer of criminal aliens into federal custody." (ECF No. 14 at 30.) But again, the cited provisions contemplate only that

states would be able, but not required, to assist in such a transfer. And while the regulations outline that a state "agency shall maintain custody of the alien for a period not to exceed 48 hours . . . in order to permit assumption of custody by the" federal government, 8 C.F.R. § 287.7(d), the Third Circuit has ruled "that ICE detainers are indeed permissive, not mandatory" because "[u]nder the Tenth Amendment," and the anticommandeering doctrine, "immigration officials may not order state and local officials to imprison suspected aliens subject to removal at the request of the federal government." *Galarza v. Scalcyzk*, 745 F.3d 634, 642-43 & n.9 (3d Cir. 2014). In other words, if the INA's detainer provisions provided a basis for preemption, the result would be that the detainers were mandatory in violation of the anticommandeering doctrine. Thus, 8 U.S.C. § 1226(c), § 1231(a), and its corresponding regulations cannot serve as a basis for conflict preemption.

*c. Provisions Criminalizing Obstruction of Federal Immigration Operations*

The United States' Complaint also states that EO12 is preempted on the basis of several provisions that criminalize the obstruction of federal immigration operations: 18 U.S.C. §§ 372, 1071, and 8 U.S.C. § 1324(a)(1)(A)(iii). (ECF No. 1 ¶¶ 30, 68, 72; *see also* ECF No. 18-1 at 7-8 (*amicus curiae* FAIR discussing the provisions).) Under § 372, it is a crime for "two or more persons . . . to prevent, by force, intimidation or threat, any person from . . . discharging any duties" of an officer of the United States. 18 U.S.C. § 372. Section 1071 criminalizes "harbor[ing] or conceal[ing] any person for whose arrest a warrant or process has been issued under the provisions of any law of the United States, so as to prevent his discovery and arrest[.]" *Id.* § 1071. And under § 1324 of the INA, it is a crime to "knowing[ly]" or "reckless[ly] . . . conceal, harbor, or shield from detection" a non-citizen who "has come to, entered, or remains in the United States in violation of law[.]" 8 U.S.C. § 1324(a)(1)(A)(iii).

These provisions do not preempt EO12. First, the United States appears to abandon these provisions as a basis for preemption. It nowhere cites § 372 or § 1071 in its opposition brief arguing that EO12 is preempted. (*See generally* ECF No. 14.)[11] *See John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing . . . but not squarely argued[ ] are considered waived"); *Pearson v. Teamsters Loc. Union 863,* Civ. No. 12-2293, 2013 WL 5676802, at *2 (D.N.J. Oct. 17, 2013) ("Failure to raise legal arguments in opposition to a motion to dismiss results in waiver.") (citations omitted).

Second, even if the United States had not abandoned these arguments, they would still be unavailing. Section 372 is not implicated because it applies only where federal officers are prevented from discharging their duties, but EO12 does not prevent the United States from carrying out federal immigration laws; rather, it declares that New Jersey will not provide its own resources to assist the United States in these efforts. If New Jersey were required to offer its resources, such a requirement would violate the anticommandeering doctrine. *See supra* Section III.B.1.b; *United States v. California*, 921 F.3d 865, 888 (9th Cir. 2019) ("[R]efusing to help is not the same as impeding. If such were the rule, obstacle preemption could be used to commandeer state resources and subvert Tenth Amendment principles." (citation modified)).[12]

And the provisions that criminalize harboring, concealing, or shielding individuals in violation of the immigration or other laws of the United States are likewise not implicated. *See* 18

---

[11] The United States cites 8 U.S.C. § 1324 only in the background section of its opposition brief. (*See* ECF No. 14 at 13.)

[12] Even if EO12 could be construed as "prevent[ing]" federal officers from carrying out their responsibilities, and even if that construal were constitutional, § 372 cannot serve as a basis for preemption for the independent reason that the Complaint does not plausibly allege that EO12 requires the use of "force, intimidation or threat" to prevent the carrying out of those responsibilities. 18 U.S.C. § 372.

U.S.C. § 1071; 8 U.S.C. § 1324(a)(1)(A)(iii). Through a passing reference to these provisions, (ECF No. 1 ¶¶ 30, 72), the United States falls far short of alleging that EO12 would constitute criminal "harbor[ing]," "conceal[ing]," or "shield[ing]," *see Illinois,* 796 F. Supp. 3d at 530 n.19 (rejecting argument that 8 U.S.C. § 1324 served as basis for conflict preemption); *United States v. New York*, 814 F. Supp. 3d 266, 280 n.7 (N.D.N.Y. 2025) (same). Nor could the United States make such an allegation; a statute that criminalizes a state's refusal to offer its resources to federal immigration officers would run afoul of the anticommandeering doctrine because it would require state officers to offer resources to the federal government to avoid criminal liability. *See Printz*, 521 U.S. at 935 ("The Federal Government may . . . no[t] command the States' officers . . . to administer or enforce a federal regulatory program.").

*d. Provisions Not Cited in the Complaint*

In its opposition, the United States introduces three provisions as a basis for preemption that it does not cite in its Complaint: 8 U.S.C. §§ 1226(a), 1229(e), and 1357(a)(2). (ECF No. 14 at 28, 31.) None of these provisions provide a basis for preemption.

Under the first and third provisions, the INA authorizes federal agents to make civil immigration arrests, with or without an administrative warrant. *See* 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."); *id.* § 1357(a)(2) (providing that immigration officers "shall have power without warrant" to "arrest any alien who . . . is entering or attempting to enter the United States in violation of any [immigration] law or regulation . . . or to arrest any alien in the United States, if . . . the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained"). However,

"those sections are silent as to whether such arrests [must be allowed in state] courthouses" or other property owned by the states. *New York*, 810 F. Supp. 3d at 346.

By contrast, elsewhere in § 1357(a), Congress has specified those places where, and circumstances under which, federal officers can obtain warrantless access. *See* 8 U.S.C. § 1357(a)(3) (immigration officers "shall have power without warrant . . . within a distance of twenty-five miles from any . . . external boundary [of the United States] to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States"). The lack of reference to state-owned property is therefore telling. *See City & County of San Francisco v. EPA*, 604 U.S. 334, 344 (2025) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation modified)); *Whiting*, 563 U.S. 582 at 607 ("[A] high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." (citation modified)).

As for § 1229(e), the United States argues that the provision "expressly contemplat[es] that immigration enforcement actions may take place at state courthouses." (ECF No. 14 at 31.) Section 1229 involves the initiation of removal proceedings. Under that provision, "where an enforcement action leading to a removal proceeding was taken against an alien at . . . a courthouse . . . if the alien is appearing in connection with a . . . civil or criminal case relating to domestic violence, sexual assault, trafficking, or stalking in which the alien has been battered or subject to extreme cruelty," then "the Notice to Appear shall include a statement that the provisions of [8 U.S.C. §] 1367 . . . have been complied with." 8 U.S.C. § 1229(e). Section 1367, in turn, "prohibits the Departments of Justice, Homeland Security, and State from making an adverse determination

of admissibility or credibility using information furnished solely by various people who battered or subjected the noncitizen[.]" *New York*, 810 F. Supp. 3d at 347 (describing the interplay of 8 U.S.C. § 1229(e) and 8 U.S.C. § 1367); *see also State of New York v. U.S. Immigr. & Customs Enf't*, 431 F. Supp. 3d 377, 393 (S.D.N.Y. 2019) (same).

Section 1229(e) therefore encourages non-citizen victims of domestic violence to attend court hearings involving their abusers without fear that the information revealed in those hearings will be used against them in the removal context. While § 1229(e) does appear to contemplate that immigration arrests take place in courthouses, the Court finds the provision falls short of what is needed to establish that the "clear and manifest purpose of Congress" in enacting this provision was to require states to allow immigration arrests on their property. *Arizona*, 567 U.S. at 400. It would be implausible for a provision that is meant to encourage court attendance to also serve the dueling purpose of requiring that federal officials be permitted to take advantage of that attendance to effectuate detentions. *See New York*, 810 F. Supp. 3d at 347 (discussing the contradiction); *State of New York*, 431 F. Supp. 3d at 393 ("[I]t would be odd to view a provision meant to encourage aliens' attendance at court as evidence of Congressional intent to allow ICE to undermine that very objective."). And, in any event, immigration officers may, under EO12, still make arrests in *public* areas of state courthouses without a judicial warrant. (*See* ECF No. 1-4 ¶ 2; ECF No. 10-1 at 33-34, 42.)

*e. Provisions in Tandem*

The United States argues a provision-by-provision analysis is inappropriate because it is necessary to consider the provisions "in sequence . . . to see the force of [the United States'] logic." (ECF No. 14 at 29.) However, a court must undertake a provision-by-provision analysis because "all preemption arguments must be grounded in the text and structure of the federal statute at

issue," *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 463 (3d Cir. 2021) (citation modified), and "[i]nvoking some brooding federal interest" is not enough, *Va. Uranium,* 587 U.S. at 767 (Gorsuch, J., plurality opinion). Regardless, when zooming out and viewing the provisions in sequence, the provisions paint a clear picture: Congress contemplated state assistance in federal immigration enforcement, but it contemplated that assistance on a voluntary basis. The fact that New Jersey has decided not to volunteer—in the limited context of EO12—is in accordance, not in conflict, with Congress's design. *See McHenry County v. Kwame Raoul*, 44 F.4th 581, 592 (7th Cir. 2022) ("It would make no sense to hold that a federal statute premised on [voluntary] State cooperation preempts a State law withholding that cooperation.").

Further, had preemption stood as an obstacle to EO12, any law or combination of laws serving as the basis for preemption would run afoul of the anticommandeering doctrine because those laws would "conscript state governments as its agents" in immigration enforcement. *New York*, 505 U.S. at 178. Courts have repeatedly held that these federal laws cannot preempt policies that limit state assistance with federal immigration enforcement. *See California,* 921 F.3d at 890 ("Extending conflict or obstacle preemption to [California's challenged policy] would, in effect, 'dictate[] what a state legislature may and may not do,' because it would imply that a state's otherwise lawful decision not to assist federal authorities is made unlawful when it is codified as state law." (quoting *Murphy*, 584 U.S. at 474)); *Illinois*, 796 F. Supp. 3d at 531 ("Even if the [challenged policies, which prohibited state and local law enforcement from giving ICE access to individuals in custody and allowing ICE to use local facilities for investigative interviews,] obstruct federal immigration enforcement, the United States' position that such obstruction is unlawful runs directly afoul of the Tenth Amendment and the anticommandeering rule." (citation modified)); *United States v. Colorado*, 831 F. Supp. 3d 1108, 1117 (D. Colo. 2026) ("[H]olding

that the limitations on federal immigration official access to city and county jails for interview and immigration enforcement purposes violates the Supremacy Clause would [run afoul of the anticommandeering doctrine because it would] require the city and county of Denver to allow the [f]ederal [g]overnment access to and use of its facilities for federal immigration purposes."). And if these laws did preempt EO12, the federal government would improperly shift some of the costs of immigration enforcement to the states and obscure "who to credit or blame" for immigration enforcement on state-property. *Murphy*, 584 U.S. at 473-74. The Court will therefore dismiss Count One.

### *2. Intergovernmental Immunity*

"Because federal law is supreme, 'there is a plain repugnance' in letting states 'interfer[e] with or control[ ] the operations of the [f]ederal [g]overnment.'" *CoreCivic*, 145 F.4th at 321 (first quoting *McCulloch*, 17 U.S. at 431; then quoting *United States v. Washington*, 596 U.S. 832, 838 (2022)). "To enforce this core principle, known as intergovernmental immunity, modern courts apply a two-pronged test: States cannot [1] regulate the United States government directly or [2] discriminate against it." *Id.* (citation modified). The United States asserts EO12 does both, and Defendants disagree. (ECF No. 10-1 at 36-46; ECF No. 14 at 32-38.)

#### *a. Regulation*

"Intergovernmental immunity is not a formalist doctrine." *CoreCivic*, 145 F.4th at 322. "In gauging intergovernmental immunity, the [Supreme] Court has long instructed us to 'look through form and behind labels to substance.'" *Id.* (quoting *City of Detroit v. Murray Corp. of Am.*, 355 U.S. 489, 492 (1958)). Accordingly, when a state action "technically appl[ies] only to" an actor that is not the federal government, that action will still violate intergovernmental immunity if, in practice, "it directly *regulates* the federal government by telling it how to carry out a core function." *Id.* at 326 (emphasis added).

However, when a state prohibits activity on its own property, the state "is acting as a proprietor, not a regulator." *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 205 (5th Cir. 2024). In other words, when a state is "simply defining, as a proprietor, what activities are not permissible in state-owned facilities" such "conduct does not run afoul of the intergovernmental immunity doctrine." *New York*, 810 F. Supp. 3d at 352-53 (first citing *Texas*, 123 F.4th at 205; then citing *City of Chicago v. Sessions*, 888 F.3d 272, 282 (7th Cir. 2018), *vacated in part on other grounds*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018)).

In *New York*, the United States sought to enjoin provisions of New York's Protect Our Courts Act and Executive Orders 170 and 170.1. *Id.* at 333. As is relevant here, Executive Order 170.1 outlined that "[c]ivil arrests by federal immigration authorities may only be executed within state facilities when accompanied by a judicial warrant or judicial order authorizing them to take into custody the person who is the subject of such warrant, unless the civil arrest is related to a proceeding within such facility." *Id.* at 337 (alteration in original) (quoting 9 N.Y.C.R.R. § 8.170.1(B)). The court held the United States failed to allege a plausible claim of direct regulation in violation of the intergovernmental doctrine with respect to Executive Order 170.1 because, "to the extent [it] appl[ied] to state-owned facilities, New York 'is acting as a proprietor, not a regulator.'" *Id.* at 352 (quoting *Texas*, 123 F.4th at 205).

Here, the United States does not plausibly allege that EO12 violates the regulation prong of the intergovernmental immunity doctrine. Defendants are acting as proprietors, not regulators. *Texas*, 123 F.4th at 205; *New York*, 810 F. Supp. 3d at 352-53.[13] Indeed, EO12 prohibits state employees from permitting federal immigration officers from (1) "entering, accessing, or using

[13] The United States fails to distinguish, or even cite to, *Texas* or *New York* in its briefing. (*See generally* ECF No. 14.)

*nonpublic areas of State property* for the purpose of facilitating federal enforcement of civil immigration law," (ECF No. 1-4 ¶ 2 (emphasis added)), and (2) "using *State property* as a staging area, processing location, or operations base for the purpose of facilitating federal enforcement of civil immigration law," (*id.* ¶ 3 (emphasis added).) This is unlike *CoreCivic*, where the challenged state action did not concern access to state-owned property but instead pertained to a law that banned "the state, its local governments, and private parties from making, renewing, or extending any contract to detain people for civil immigration violations." *CoreCivic*, 145 F.4th at 320. And the Third Circuit made clear its holding was "narrow" to avoid "open[ing] the door to far more claims of immunity." *See id.* at 329 ("We address only a state ban on contracting in a market where the federal government is the only available counterparty for services implementing a core federal power.").

Even if the Court put aside the proprietor-regulator dichotomy, it would still find no plausible violation of the first prong of the intergovernmental doctrine because the burden imposed by EO12 does not rise to an unconstitutional level. *See id.* ("Regulations that merely burden [the federal government or its contractors] without substantially interfering with the federal government's operations . . . may pose different intergovernmental-immunity questions."); *New York*, 810 F. Supp. 3d at 354 ("The complaint . . . fails to allege that the Executive Orders impose a burden on the federal government in a way the intergovernmental immunity doctrine considers problematic [because u]nlike most discrimination cases in which a state affirmatively levies a tax or cost on the federal government, the Executive Orders here simply decline to ease the burden of civil immigration enforcement by permitting state and local government agents to assist." (citing *Washington*, 596 U.S. at 838-39)).

Here, EO12 does not "substantially interfer[e]" in a manner contemplated by the intergovernmental immunity doctrine. *CoreCivic*, 145 F.4th at 329. On a statutory level, EO12 does not substantially interfere because it does not conflict with any federal statutory duties. *See supra* Section III.B.1. Nor does it substantially interfere in a practical sense. Courts have found impermissible interference when, for example, a statewide policy imposed a ban on privately run detention facilities—like in *CoreCivic*—and ICE relied "almost exclusively on privately owned and operated facilities in California," *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022) (en banc), or when a county executive order "prevent[ed] ICE's contractors from continuing to operate flights" in the county "thereby requiring ICE to entirely transform its approach to its sovereign function of transporting and removing noncitizen detainees," *King County*, 122 F.4th at 756 (citation modified).

The United States does not allege facts suggesting that immigration officers "almost exclusively" rely on private state-owned property to effectuate immigration enforcement or that it has to "entirely transform" its approach to immigration enforcement as a result of EO12. *Geo Grp.*, 50 F.4th at 750; *King County*, 122 F.4th at 756. Indeed, the ICE guidance on which the United States relies states that immigration enforcement efforts are safer "in *or near* courthouses," (ECF No. 1-3 at 2) (emphasis added), but under EO12, those efforts can still take place near the courthouses, in public areas within state courthouses, and in *all* areas of federal, county, and municipal courthouses, (ECF No. 1-4 ¶ 2). Thus, by merely "seeking to preserve its *own* property," Defendants "[a]t most . . . might incidentally affect how agents do their jobs." *Texas*, 123 F.4th at 207 (emphasis in original). This is insufficient to constitute unlawful regulation. Accordingly, the United States has failed to plausibly allege that EO12 crosses the line into direct regulation of the federal government, so Count Two will be dismissed.

*b. Discrimination*

"A state law discriminates against the federal government," and thereby violates intergovernmental immunity, "when it treats similarly situated state and federal actors differently in a way that cannot be explained by significant differences between the two." *CoreCivic*, 145 F.4th at 321 (citations modified). The United States offers three arguments for why EO12 runs afoul of this mandate, but each is unpersuasive.

First, the United States argues that EO12 "is facially discriminatory because it targets only federal officers," and there is "no need to look for comparators." (ECF No. 14 at 36.) However, the United States fails to cite any case in which a court found a violation of the intergovernmental doctrine without reference to a comparator. Indeed, it could not because such proposition would be at odds with Supreme Court precedent. *See Washington v. United States,* 460 U.S. 536, 544-45 (1983) ("The State does not discriminate against the [f]ederal [g]overnment and those with whom it deals unless it treats someone else better than it treats them."). The United States therefore cannot plead discrimination without reference to a comparator.

Second, the United States contends that, under the Supreme Court's decision in *United States v. Washington*, 596 U.S. 832 (2022), a state may not "treat the [f]ederal [g]overnment unfavorably on some basis related to its governmental status." (ECF No. 14 at 36-37.) This is true, but the law in *Washington*—which created a causal presumption that made it easier for certain federal contract workers to obtain workers' compensation benefits from their federal employer—violated the Supremacy Clause because it "explicitly treat[ed] federal workers differently than state or private workers," which resulted in an imposition "upon the [f]ederal [g]overnment [of] costs that state or private entities [did] not bear." 596 U.S. at 836, 839. In other words, a

comparator analysis is still required to determine whether the [f]ederal [g]overnment is being treated unfavorably on the basis of its governmental status.

It is this comparator analysis where the United States turns to next. The United States argues there are sufficient comparators: other federal, state, and local law enforcement officers who, according to the United States, may still operate on state property without restriction. (ECF No. 14 at 37.) As an initial matter, to violate the Supremacy Clause, the proper comparator analysis is between federal and non-federal actors rather than between federal actors from different agencies. *See CoreCivic*, 145 F.4th at 321 ("A state law discriminates against the federal government when it treats similarly situated state and federal actors differently in a way that cannot be explained by significant differences between the two." (citation modified)); *Illinois,* 796 F. Supp. 3d at 534 ("For a state law to unconstitutionally discriminate against the federal government, it must treat comparable classes of federal and *non-federal* employees differently, not different classes of federal employees[.]" (emphasis in original)). Therefore, reference to other federal law enforcement officers as a comparator is unpersuasive.

Thus, the question is whether state and local law enforcement are "similarly situated," *CoreCivic*, 145 F.4th at 321, and therefore appropriate comparators to, federal immigration officers. The Court holds they are not. EO12 prohibits New Jersey executive branch departments and agencies from allowing federal immigration officers to use state property "for the purpose of facilitating federal enforcement of civil immigration law." (ECF No. 1-4 ¶¶ 2-3.) But there is no other entity besides the federal government that could be the beneficiary of this facilitation because "only the federal government is authorized to enforce civil immigration law." *New York*, 810 F. Supp. 3d at 353. Local and state law enforcement officials are therefore not similarly situated for comparator purposes.

This is fatal to the United States' discrimination claim. When a state action "touches on an exclusively federal sphere" and a plaintiff therefore cannot "identify any actors 'similarly situated' to the federal government that receive more favorable treatment," the plaintiff has not done "enough to establish discrimination." *McHenry County*, 44 F.4th at 594; *see also id.* at 594 n.7 ("The State's refusal to cooperate in the immigration context—a possibility contemplated by the relevant federal statutes—does not constitute discrimination against the federal government."); *New York*, 810 F. Supp. 3d at 353 ("[T]he fact that a law affects an exclusively federal domain is not evidence of discrimination[.]").[14] Thus, the United States has not plausibly alleged that EO12 discriminates against the federal government in violation of the Supremacy Clause, so the Court will dismiss Count Three.

## IV. CONCLUSION

For the foregoing reasons, and other good cause shown, Defendants' Motion to Dismiss (ECF No. 10) is **GRANTED.** An appropriate Order follows.

Dated: September 4, 2026

Georgette Castner

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE

---

[14] In any event, courts have held that a "finding that . . . [a state] *cannot* choose to discriminate against federal immigration authorities by refusing to assist their enforcement efforts . . . would be inconsistent with the Tenth Amendment and the anticommandeering rule." *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019) (emphasis in original); *see also United States v. Minnesota*, Civ. No. 25-3798, 2026 WL 2085701, at *22 (D. Minn. July 20, 2026) ("[A]ccepting the United States' [discriminated-based] intergovernmental-immunity claims here would seem inconsistent with the anticommandeering-rule-based rejection of its preemption claims [because] . . . . [a] finding that any of the challenged provisions violates intergovernmental immunity would imply that a [d]efendant must assist with the federal government's immigration enforcement efforts.")